M. G. THOMAS v. W. H. RAY, JR., BANKINGPORT, INC., AND GREAT AMERICAN INSURANCE COMPANY

No. 8311SC911

(Filed 3 July 1984)

**Estoppel § 4.5— insurance on vehicle—nonpayment of premiums—plaintiff's knowledge—no estoppel of insurance company and agent**

Where plaintiff agreed to sell a house to a third party in exchange for certain consideration, including a Cadillac upon which the third party agreed to maintain insurance coverage, the third party obtained a renewal collision policy through defendant but never paid the premium despite notice of cancellation, plaintiff was driving the automobile when it was involved in an accident and sustained damage, the third party asked defendant about payment of the damage to the vehicle under the policy but was told there was no coverage because of nonpayment of premiums, at the time plaintiff and the third party closed their car-house deal plaintiff placed the balance of the purchase price of the vehicle in escrow to be paid over to the third party upon acknowledgment by the insurance company that the claim would be paid, defendant sent a letter to the seller of the vehicle stating that the insurance

company would pay the claim, plaintiff then authorized release of the funds in escrow to the third party, and the insurance company thereafter refused to pay the claim on the basis that its only obligation was to the lienholder who had been paid in full from the escrow funds, plaintiff was precluded as a matter of law from asserting estoppel against defendants, since plaintiff's insistence that the balance of the purchase price of the car be placed in escrow pending resolution of the claim was convincing evidence that plaintiff was fully aware that there was a serious problem with the insurance coverage; he was therefore on notice at least to inquire as to the reasons for non-coverage; his failure to make such inquiry and to tender any portion of the premium, both established by the uncontradicted record, constituted contributory negligence as a matter of law; plaintiff ratified the third party's nonpayment of the insurance premiums by going forward with the car-house deal at the original price; and the defects in the car itself and the worthlessness of the third party's insurance were known to him, actually or constructively. Furthermore, where plaintiff, without inquiry and in the face of repeated denials of coverage as to the policyholder through whom he claimed, volunteered payment to a third party to whom he had no legal obligation based on a letter between defendant and another party, plaintiff was barred by his own negligence as a matter of law from relying on the letter to raise an estoppel against defendants.

APPEAL by plaintiff from *Smith, Judge.* Judgment entered 7 April 1983 in Superior Court, LEE County. Heard in the Court of Appeals 11 May 1984.

*J. Douglas Moretz, P.A., for plaintiff appellant.*

*Patterson, Dilthey, Clay, Cranfill, Sumner & Hartzog, by D. James Jones, Jr., and Theodore B. Smyth, for defendant appellees.*

BECTON, Judge.

Plaintiff appeals from summary judgment against him, which denied his claim that defendants were estopped to deny coverage under an automobile collision policy. We hold that plaintiff could not assert estoppel, and we affirm.

I

The facts of the case, although not really in dispute, are rather complicated. We have arranged them chronologically as follows:

1. In July 1979, Roy Herring purchased a new Cadillac from Doug Wilkinson of Wilkinson Cadillac-Oldsmobile (Wilkinson) for

approximately $18,000.00. Financing was through General Motors Acceptance Corporation (GMAC), which received the installment contract by assignment from Wilkinson. Wilkinson had a repurchase obligation in the event of Herring's default, and GMAC had recourse against Wilkinson.

2. In 1980, Herring's insurance agent, William Ray of Bankingport, Inc., transferred the collision coverage on the Cadillac to Great American Insurance Company (GAIC).

3. In January 1981, Herring and M. G. Thomas orally agreed that Thomas would sell Herring a house. Herring would assume the mortgage on the house, and, in exchange, Thomas would receive cash and the Cadillac. Herring allowed Thomas to use the Cadillac prior to closing, with the provision that Herring would meet the payments and keep up insurance coverage.

4. In February 1981, Herring, through Ray, obtained a renewal collision policy with GAIC effective until August 1981. Herring did not pay any premium at this time.

5. On 10 March 1981, GAIC notified Herring that he had to pay his premium by 28 March 1981 to "continue" insurance protection.

6. On 30 March 1981, having received a check from Herring, GAIC rescinded its notice of cancellation, stating that the insurance continued in effect.

7. On 27 April 1981, GAIC prepared a "reversal notice," which informed Herring that his check had been returned for insufficient funds. The notice demanded payment of premium by 15 May 1981 to "continue" coverage. The record is unclear when Herring received the notice.

8. On 29 April 1981, Thomas was driving the Cadillac when it left the road in a curve and rolled over into an open field. The Cadillac sustained about $8,000 worth of damage; no other cars were involved and no other injury to persons or property occurred.

9. Shortly after the accident Herring asked about payment of the damage to the Cadillac under the GAIC policy. Ray said there was no coverage because of nonpayment of premiums.

10. Thereafter, on 19 May 1981, a final notice of cancellation was issued by GAIC.

11. Also on 19 May 1981, Thomas and Herring closed their deal. Thomas took title to the Cadillac. Herring still owed GMAC $12,763.18, and Thomas placed that amount in escrow, to be paid over to Herring upon acknowledgment by GAIC that the claim would be paid. Herring ceased making payments on the Cadillac at about this time.

12. Ray discussed the claim with GAIC. In addition, Wilkinson, who under the original sale contract was obligated to buy the Cadillac if the loan was not paid, began inquiring of Ray and Herring if GAIC would honor the claim.

13. On 17 June 1981 Ray wrote to Wilkinson and Herring informing them that there was no coverage.

14. On 14 July 1981, after further discussions with GAIC, GMAC, Wilkinson and Herring, Ray sent the following letter to Wilkinson:

Re: Roy Herring Claim

Dear Doug [Wilkinson]:

Per our phone conversation this date, this letter is to inform you that Great American Insurance Company is going to honor the above claim.

If I can be of any other help, please let me know.

15. Wilkinson informed Herring, who got a copy of the letter and took it to Thomas. Thomas authorized release of the $12,763.18 from escrow. The escrow agent issued a check in that amount jointly to Herring and GMAC; Herring delivered the check to Wilkinson, who forwarded it to GMAC which negotiated the check.

16. GAIC thereafter refused to pay the claim, on the basis that its obligation lay only to the lienholder, GMAC. Since GMAC had received payment in full, that obligation was extinguished and GAIC refused to pay.

17. Thomas thereupon brought the present action against GAIC, Ray, and Bankingport, Inc., Ray's agency, to recover the

amount of the unpaid claim, as well as treble damages for unfair and deceptive trade practices. Neither Herring, GMAC nor Wilkinson was made a defendant. From summary judgment against him on all claims, Thomas appeals.

## II

This appeal presents one major issue: was Thomas unable, as a matter of law, to assert estoppel against defendants? Thomas argues that summary judgment was inappropriate, contending that the evidence raised a genuine issue of fact as to his justifiable reliance on the 14 July 1981 letter. Therefore, Thomas argues, the applicability of equitable estoppel, requiring defendants to honor the claim, must be resolved by a jury. Defendants, on the other hand, argue that Thomas' own negligence as a matter of law precludes him from proceeding on an estoppel theory.

## A

In a case such as this, summary judgment is appropriate when the defendants as the moving parties establish the absence of any genuine issue of fact as to a complete defense to the opponent's claim. *Kidd v. Early*, 289 N.C. 343, 222 S.E. 2d 392 (1976); *Ballinger v. Dept. of Revenue*, 59 N.C. App. 508, 296 S.E. 2d 836 (1982). *disc. rev. denied*, 307 N.C. 576, 299 S.E. 2d 645 (1983). If the factual evidence, taken in the light most favorable to the non-movant, allows no inferences inconsistent with the defense, the movant has satisfied his burden, and summary judgment in its favor will be affirmed. *Id.* This is true even when the facts raise difficult questions of law. *Kessing v. Nat'l Mortgage Corp.*, 278 N.C. 523, 180 S.E. 2d 823 (1971).

## B

Our Supreme Court has authoritatively set forth the elements of an equitable estoppel:

> [T]he essential elements of an equitable estoppel as related to the party estopped are: (1) Conduct which amounts to a false representation or concealment of material facts, or, at least, which is reasonably calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party afterwards attempts to assert; (2) intention or expectation that such conduct shall be acted upon by the

other party, or conduct which at least is calculated to induce a reasonably prudent person to believe such conduct was intended or expected to be relied and acted upon; (3) knowledge, actual or constructive, of the real facts. As related to the party claiming the estoppel, they are: (1) lack of knowledge and the means of knowledge of the truth as to the facts in question; (2) reliance upon the conduct of the party sought to be estopped; and (3) action based thereon of such a character as to change his position prejudicially.

*Hawkins v. M & J Finance Corp.*, 238 N.C. 174, 177-78, 77 S.E. 2d 669, 672 (1953). The element of lack of knowledge and means of knowledge on the part of the party asserting estoppel imports principles of negligence, and hence contributory negligence, into its application. Absent some fraud, estoppel is not available to protect a party against the consequences of his own negligence. *Wachovia Bank & Trust Co. v. Wayne Finance Co.*, 262 N.C. 711, 138 S.E. 2d 481 (1964); *Peek v. Wachovia Bank & Trust Co.*, 242 N.C. 1, 86 S.E. 2d 745 (1955). For the following reasons, we conclude that summary judgment was proper, since Thomas' own negligence as a matter of law precluded him from successfully asserting estoppel.

### C

The uncontradicted record discloses that neither Herring nor Thomas ever paid a single penny in premiums to GAIC under the renewal policy. Giving a worthless check does not constitute payment. *Cauley v. Gen'l American Life Ins. Co.*, 219 N.C. 398, 14 S.E. 2d 39 (1941). Unless payment of the premium is waived, it is a condition precedent to coverage. *Engelberg v. Home Ins. Co.*, 251 N.C. 166, 110 S.E. 2d 818 (1959) (per curiam) (payment by agent does not constitute payment by insured). And nonpayment of premium when due, or within the period of grace thereafter, has repeatedly been held to automatically avoid the policy. *Allen v. Nat'l Accident & Health Ins. Co.*, 215 N.C. 70, 1 S.E. 2d 94 (1938). This is true for the simple reason that insurance companies are businesses, and they rely on premiums for their existence. *See Hay v. Ass'n*, 143 N.C. 256, 55 S.E. 623 (1906).

We are aware that insurance companies have wrongfully denied coverage in some cases in which bad faith or careless business practices might reasonably be imputed to them. *See e.g.*,

*Gaston-Lincoln Transit, Inc. v. Maryland Cas. Co.*, 285 N.C. 541, 206 S.E. 2d 155 (1974) (company estopped to deny coverage when it attached limiting rider without notifying insured). Here, however, the insurance company allowed Herring substantial latitude in making his payments. Having received no premium two weeks after issuance, GAIC *indicated it would still continue coverage if Herring paid within 18 days.* It rescinded the notice of cancellation upon receipt of Herring's check. Four weeks later, when Herring's check bounced, GAIC still was willing to continue coverage upon receipt of certified payment in 18 days. By the same notice GAIC warned Herring that the law imposed a duty upon him to maintain financial responsibility coverage. Even *after* the accident on 29 April 1981 had resulted in thousands of dollars in damage to the Cadillac, payment of only $197 by 15 May 1981 would have assured coverage for that damage, but neither Herring nor Thomas ever paid GAIC anything. Only after almost three months did GAIC finally cancel the policy. No bad faith or careless practice is apparent in this conduct by GAIC; if anything, GAIC made an extra effort to protect and serve a customer whose conduct indicated an obvious business risk.

Clearly, then, Herring had no coverage under the policy itself, and Thomas cannot now claim that any reliance on his part on the terms thereof was justified. His insistence that the money be placed in escrow pending resolution of the claim is convincing evidence that Thomas was fully aware that there was a serious problem with the insurance coverage. And accordingly, he was on notice at least to inquire as to the reasons for non-coverage, even if he did not actually know that Herring had never paid any premium. His failure to make any such inquiry and to tender any portion of the premium, both established by the uncontradicted record, constituted contributory negligence as a matter of law barring recovery on estoppel under the policy.

### D

The house-car deal was first made in January 1981, as part of which Herring agreed to maintain collision coverage on the Cadillac. Herring failed to perform this part of the oral agreement. Notwithstanding this breach, and notwithstanding the fact that Thomas knew or should have known of it, Thomas went ahead and agreed to pay Herring the full value of the Cadillac. Although

the accident occurred some three weeks before the closing, Thomas did not obtain in the interim (or subsequently) any appraisal of the actual damage to the automobile. He did not seek any reduction in the purchase price as a result of Herring's breach. The reason for this failure does not appear from the record. If there was some legal reason for paying the full price for the Cadillac, it was incumbent upon Thomas to forecast some evidence thereof; he did not do so. Instead, his brief indicates that he "felt obligated" to go through with the deal; that, however, does not justify equitable relief, particularly against GAIC, a third party.

Traditional equitable principles support this result, in particular the maxim that courts of equity aid those who are diligent, not those who are negligent or sleep on their rights. *W. B. Coppersmith & Sons, Inc. v. Aetna Ins. Co.*, 222 N.C. 14, 21 S.E. 2d 838 (1942). Like plaintiffs in *Coppersmith*, Thomas was an experienced businessman and the law will accordingly require him to exercise *some* reasonable diligence and prudence to protect his rights. The courts of equity in North Carolina have consistently refused to aid parties who complain of fraud or other irregularity in a disadvantageous bargain which they have ratified subsequent to discovery of the irregularity. *Brown v. Osteen*, 197 N.C. 305, 148 S.E. 434 (1929) (ratified fraud); *Moore v. Reed*, 37 N.C. (2 Ired. Eq.) 580 (1843) (drunk at time of contract, ratified when sober); *Ridings v. Ridings*, 55 N.C. App. 630, 286 S.E. 2d 614, *disc. rev. denied*, 305 N.C. 586, 292 S.E. 2d 571 (1982) (subsequent payment of alimony ratified contract allegedly signed under undue influence). Here, Thomas ratified Herring's nonpayment of the insurance premiums by going forward with the deal at the original price. The defects in the Cadillac itself and the worthlessness of Herring's insurance were known to him, actually or constructively. Having made this bargain, despite knowledge of Herring's breach and circumstances rendering the bargain much less valuable than it was originally, Thomas cannot now claim equitable relief. His own indifference to the consequences precludes such a claim.

### III

Therefore, unless defendants were estopped by the letter of 14 July 1981, Thomas had no rights and summary judgment was

appropriate. Final notice of cancellation was prepared by GAIC on 19 May 1981 and Ray wrote to Wilkinson and Herring on 17 June 1981 informing them that there was no coverage. The contract of insurance between Herring and GAIC had therefore clearly terminated well before 14 July 1981. The legal rights of the various parties at that time were as follows: Herring had the house; Thomas had the Cadillac; and Thomas had placed the contract value of the Cadillac in escrow pending the resolution of the claim. Wilkinson had an obligation to pay off GMAC if Herring defaulted on the payments, for which Herring was still legally obligated. Any payment by GAIC would, under Herring's policy, go to GMAC as first lienholder. Therefore, Wilkinson had an interest in seeing that GAIC reduced his liability by paying the Herring claim. Absent from this recital is any obligation on Thomas' part to do anything other than honor his contract with Herring. No evidence appears, nor did Thomas forecast any, which would indicate any obligation on his part to pay Wilkinson or GMAC. To the extent that Thomas agreed to pay anything, that agreement could only have been between himself and Herring.

Nevertheless, when Herring received the letter from Wilkinson and showed it to Thomas, Thomas authorized release of the payment to Herring and GMAC. Obviously, as subsequently occurred, the payment was for the benefit of GMAC. *See* 2 R. Anderson, *Uniform Commercial Code* § 3-116:6 (2d ed. 1971) (effect of prior agreement on note to joint payees). Thomas admitted that he knew that that was the purpose of the payment at the time he released the money. The letter authorizing release directs payment to GMAC, not Herring. Thomas had no obligation to pay GMAC; he simply "presumed" that he would be reimbursed. He advanced no reason for this presumption, made in the face of repeated denials of coverage by GAIC to Herring, and based on a letter to a third party, Wilkinson. Thomas never inquired further of Ray, Wilkinson, or GMAC as to what the letter meant, or how and to what extent he would be reimbursed. As the complaint shows on its face, he could only expect reimbursement on the damages payable under the policy. It is clear that such reimbursement would occur, if at all, by subrogation to Herring. Herring did not have, nor has he ever asserted, any right to payment from GAIC or GMAC. It is firmly established that "[a] party can ac-

quire no better right by subrogation than that of the principal." *Dowdy v. Southern Ry. Co.*, 237 N.C. 519, 525, 75 S.E. 2d 639, 643 (1953); *Employers Mut. Cas. Co. v. Griffin*, 46 N.C. App. 826, 266 S.E. 2d 18, *disc. rev. denied*, 301 N.C. 86 (1980). Therefore, Thomas had no right to subrogation against GAIC.

We conclude that Thomas is barred by his own negligence as a matter of law from relying on the letter to raise an estoppel against defendants. Without inquiry and in the face of repeated denials of coverage as to the policyholder through whom he claimed, he volunteered payment to a third party to whom he had no legal obligation, based on a letter between yet two more parties. On these facts, summary judgment was appropriate.

## IV

We therefore hold that Thomas has shown no right to relief and that the trial court properly granted summary judgment to these defendants. This ruling appears harsh, but it is the unfortunate result of a consistent pattern of inattention and neglect. We note that the unfair windfall in this case really accrued to Herring, whom Thomas, acting at Herring's instigation, relieved of the likely responsibility for bearing the collision loss to the Cadillac. Since Thomas elected not to join Herring as a defendant, however, we are powerless to alter this sad state of affairs on appeal. The order appealed from is accordingly

Affirmed.

Judges WELLS and JOHNSON concur.