ROBERT E. WALKER v. WESTINGHOUSE ELECTRIC CORPORATION

No. 8521SC95

(Filed 15 October 1985)

**1. Master and Servant § 1— handbook not part of employment contract**

Although language in an employee handbook stated that it would "become more than a handbook . . . it will become an understanding," the handbook did not become a part of plaintiff's employment contract where it was not expressly included in it and thus did not restrict defendant employer's right to terminate plaintiff's employment.

**2. Master and Servant § 10— employment at will**

Plaintiff worked as an employee at will, and his employment could be terminated at any time by his employer, where his contract of employment did not contain a specified term or fixed duration, plaintiff gave no consideration in addition to the usual obligation of service, and there was no evidence that the employer took advantage of plaintiff or that he did not receive full pay for his services.

**3. Master and Servant § 10.2— wrongful discharge for raising safety concerns— insufficient forecast of evidence**

Assuming that a cause of action exists for wrongful discharge in retaliation for raising safety concerns, plaintiff's forecast of evidence was insufficient to survive defendant employer's motion for summary judgment where it contained no suggestion of the length of the interval between the times when plaintiff raised safety concerns and his discharge; plaintiff's own evidence

showed that most of the safety concerns raised were actually unpleasant working conditions about which little could be done and about which other workers had complained; and plaintiff presented no evidence from others who worked in the allegedly unsafe conditions and no evidence of state or federal safety requirements violated.

APPEAL by plaintiff from *Wood, William Z., Judge*. Judgment entered 29 August 1984 in Superior Court, FORSYTH County. Heard in the Court of Appeals 30 August 1985.

This is an action for wrongful discharge. Plaintiff employee worked for three years as a senior electrician for defendant employer, for whom he had worked ten years altogether. Plaintiff's responsibilities at the time of his discharge included maintaining industrial machinery throughout a large factory building. He had no set work place or work schedule, and carried a radio pager to enable him to respond to breakdowns throughout the building. Plaintiff took breaks on an informal basis when work was slack.

Plaintiff was working on Saturday, 22 November 1980 but work was very slack. Plaintiff completed his rounds of the operating machines and he apparently had no other work to do. He went to the snack bar, bought a soft drink and crackers and then went into the adjacent company auditorium. There was a big-screen television set there. According to plaintiff, because he was interested in purchasing one, he flipped it from videotape play-back to regular reception and sat down to view it. He had been sitting there for about fifteen minutes when a plant supervisor came in. The supervisor told plaintiff to leave the plant immediately. Plaintiff was subsequently discharged permanently from his employment with defendant.

Plaintiff had no prior formal disciplinary actions. In the past, he had brought what he perceived to be safety concerns to the attention of supervisory personnel. Most of these were not strictly safety related, however, but involved unpleasant working conditions. Defendant's officials maintained that they had had many informal and undocumented counseling sessions with plaintiff, and that plaintiff's explanation for his presence in the auditorium was "completely fabricated."

Plaintiff had no written contract of employment, either individually or as a member of a collective bargaining unit. Shortly

after beginning his employment with defendant, plaintiff received a copy of the employer's "Handbook for Employees" ("Handbook"), which was updated periodically by defendant. Employees had no official part in preparation of the Handbook. It contained the following provisions:

> This manual is intended as an employe guide for explanation and interpretation of the policies and procedures which govern all employes at Westinghouse, Winston-Salem. Some of the policies are corporate-wide, and some have been established at our location with the help of all supervision. These policies will also be administered within the framework of all state and federal laws.

> It is the responsibility of each management employe to fairly and consistently apply these policies to all employes.

> Further, these policies have been adopted and endorsed by the Plant Manager and Staff.

>                       *    *    *

> This revised handbook has been prepared for all employes to use as a reference and to help our new employes get acquainted with our plant. It describes the relationship we have with our people . . . our obligations to you and your obligations to your fellow employes and the plant. Some of the obligations are in the form of policies and procedures . . . some a result of mutual trust . . . some a matter of conscience.

>                       *    *    *

> Those of you who are new to the Turbine Components "family" have been selected because we feel you are the type of individual who possesses the ability that will contribute to our continued success. As a new employe, I'm sure you will soon notice the willingness of our people to work together and resolve our problems together. It is this relationship that will result in your achieving your personal goals and our business goals. This handbook is our agreement on how we will operate our business. Read through it and discuss it with your supervisor. Then it will become more than a handbook . . . it will become an understanding.

---

**Walker v. Westinghouse Electric Corp.**

---

\*    \*    \*

OUR

WINSTON-SALEM

PLEDGE

To insure that the Westinghouse Turbine Components Plant is a good place to work, management employes in our Plant pledge to honor these principles in our relations with you:

\* You will be treated fairly, as an individual, with consideration and respect.

\* You will be paid wages and salaries that on the average are equal to or higher than the average of those paid for comparable skill levels in the Plant's employment market area. We believe in paying a fair day's pay for a fair day's work.

\* You will be provided the same liberal benefits that are enjoyed by employes of other Westinghouse Plants.

\* Your well-being will be given full consideration in any decisions that may involve you.

\* You will be given every consideration for self-improvement and advancement opportunities in our Plant and your Westinghouse service and qualifications will be given full consideration with respect to advancement.

\* You will receive prompt handling — with fairness and in a friendly manner — of any problem that could be the cause of a complaint.

\* You will be provided a clean, well-ventilated place in which to work.

\* You will be provided year-round employment to the greatest practical extent.

\*    \*    \*

RULES OF CONDUCT

In disciplinary situations, the supervisor will exercise discretionary judgment in administering discipline to take what-

ever action is necessary, depending on the infraction of the rules. For consistency of administration, all disciplinary actions, other than formal verbal warnings, will be reviewed by the Personnel Relations Department prior to taking action. In infractions involving violations of the Rules of Conduct—Type A, the supervisor may suspend the employe pending an investigation and review of the infraction.

If disciplinary action is warranted, but not of the nature requiring suspension, the supervisor will notify the employe that he has committed an infraction of the Plant Rules of Conduct and he will inform him of the resulting disciplinary action after review with the Department Manager and Personnel Relations Department.

If the infraction is judged by the supervisor to warrant suspension, the supervisor will notify the employe that he has been suspended, obtain his identification badge and gate pass, and advise the employe that he will be notified within three (3) working days of the disposition of the case.

PLANT RULES AND REGULATIONS

The following is a list of the Plant Rules of Conduct that shows the appropriate disciplinary action for each. The rules are not all inclusive, but represent the type of conduct which cannot be condoned.

RULES OF CONDUCT

\* In a plant community such as ours, there are certain regulations which govern our conduct as employes while on Company property, just as there are regulations governing us as citizens in the community in which we live or as members of clubs to which we belong. These regulations—which are an aid to making our Plant a safe, pleasant, productive and desirable place to work—are for general information and to assure uniform administration of disciplinary action if ever it is necessary.

\* The rules shown are not all-inclusive but represent the type of conduct which cannot be condoned. They are divided into three main groups, depending upon the relative seriousness of the misconduct.

The three groups of rules and punishments for first infractions were Type A, which "may result in immediate discharge"; Type B, which "may result in three days off without pay"; and Type C, which "may result in a written warning." Type A misconduct included "sleeping during working time" and "gross insubordination." Type B misconduct included "willful failure or refusal to carry out instructions" and "insubordination." Type C misconduct included "loitering" and "leaving job or work area" before end of work.

Defendant's supervisory personnel maintained that plaintiff's conduct was of Type A, justifying immediate discharge. Plaintiff brought the present action in December 1982, alleging that he was wrongfully discharged in violation of his contract of employment as established in the Handbook, that his discharge was contrary to public policy, that he had relied to his detriment on fraudulent representations in the Handbook, and that defendant's conduct constituted unfair and deceptive trade practices. Following discovery, defendant moved for and was granted summary judgment on all claims. Plaintiff appeals.

*Badgett, Calaway, Phillips, Davis, Stephens, Peed & Brown, by Herman L. Stephens, for plaintiff-appellant.*

*Womble Carlyle Sandridge & Rice, by Charles F. Vance, Jr., Guy F. Driver, Jr. and M. Ann Anderson, for defendant-appellee.*

EAGLES, Judge.

Plaintiff has abandoned his unfair and deceptive trade practices claim before this court. The crucial questions remaining before us are (1) did defendant discharge plaintiff in violation of its contract of employment with plaintiff and (2) did defendant wrongfully discharge plaintiff in violation of public policy? We answer both questions in the negative.

I

A party moving for summary judgment must establish that there is no genuine issue of material fact or that it has a complete defense as a matter of law. *See Thomas v. Ray*, 69 N.C. App. 412, 317 S.E. 2d 53 (1984). The record must be viewed in the light most favorable to the non-movant, with all reasonable inferences therefrom. *Sharpe v. Quality Education, Inc.*, 59 N.C. App. 304,

Walker v. Westinghouse Electric Corp.

296 S.E. 2d 661 (1982). The movant's papers are scrutinized with care, while the non-movant's are treated indulgently. *Vassey v. Burch*, 301 N.C. 68, 269 S.E. 2d 137 (1980). We have examined the record in light of these principles.

II

[1] In order to resolve the contract questions in this case, we first must determine what constituted the contract. Plaintiff contends that the contract included the Handbook; defendant contends in essence that the contract consisted merely of its agreement to pay plaintiff certain compensation for a certain amount of work, and that the Handbook did not become part of the contract. We are aware that a growing number of jurisdictions recognize that employee manuals purporting to set forth causes for termination may become part of the employment contract even in the absence of an express agreement. *See Annot.*, 33 A.L.R. 4th 120, Section 4[a] (1984). Courts have reached this result on various grounds, including that the employer, by issuing the manual (as opposed to requiring employees to acknowledge that they may be terminated at any time) has assumed an obligation to terminate only for cause, *see Toussaint v. Blue Cross & Blue Shield*, 408 Mich. 579, 292 N.W. 2d 880 (1980); that the employee, by not looking for other work in reliance on the corporate manual, gave consideration to make the manual part of the contract, *see Wagner v. Sperry Univac*, 458 F. Supp. 505 (E.D. Pa. 1978), *aff'd*, 624 F. 2d 1092 (3d Cir. 1980) (mem.); or that the manual, having been promulgated after consultation with an employee committee, represented a contractual negotiating and bargaining process. *See Wernham v. Moore*, 77 A.D. 2d 262, 432 N.Y.S. 2d 711 (1980). We are also aware that there are strong equitable and social policy reasons militating against allowing employers to promulgate for their employees potentially misleading personnel manuals while reserving the right to deviate from them at their own caprice.

Nevertheless, the law of North Carolina is clear that unilaterally promulgated employment manuals or policies do not become part of the employment contract unless expressly included in it. *Smith v. Monsanto Co.*, 71 N.C. App. 632, 322 S.E. 2d 611 (1984); *Griffin v. Housing Authority*, 62 N.C. App. 556, 303 S.E. 2d 200 (1983); *Williams v. Biscuitville, Inc.*, 40 N.C. App. 405, 253 S.E. 2d 18, *disc. rev. denied*, 297 N.C. 457, 256 S.E. 2d 810 (1979); *Cote v.*

*Burroughs Wellcome Co.*, 558 F. Supp. 883 (E.D. Pa. 1982) (applying North Carolina law). The contract did not, under our law, include the Handbook. Despite its apparent promise to ". . . become more than a handbook . . . it will become an understanding . . . ," the Handbook did not become an understanding binding on the employer.

### III

Even if we were to assume *arguendo* that the Handbook had been part of plaintiff's contract of employment, it appears sufficiently well drafted that plaintiff nevertheless would be entitled to no relief. Though the Handbook does promise to "become more than a handbook . . . it will become an understanding," and acknowledges "the responsibility of each management employee to fairly and consistently apply" the policies in it, supervisory personnel retain final discretionary authority in disciplinary matters. The Handbook says: "In disciplinary situations, the supervisor will exercise discretionary judgment in administering discipline, to take whatever action is necessary. . . ." The Rules of Conduct expressly provide that they are not all-inclusive, and the described conduct simply "may result" in the various described disciplinary actions. While the Handbook appears to promise much, it contains little of substance to aid an employee being terminated. Accordingly, we must reject plaintiff's claim that he is entitled to relief under the contract including the Handbook.

### IV

[2] A contract of employment which does not contain a specified term or fixed duration is ordinarily not enforceable. *Still v. Lance*, 279 N.C. 254, 182 S.E. 2d 403 (1971). Since the Handbook was not a part of the contract, and the contract otherwise contained no specified term or duration, plaintiff worked as an employee at will. The contract could legally be terminated at any time at the will of either party. *Id.*; *Nantz v. Employment Security Comm.*, 290 N.C. 473, 226 S.E. 2d 340 (1976). There are certain limited exceptions to this rule.

### A

If an employee gives some additional consideration in addition to the usual obligation of service, a contract for an indefinite term may become a contract for as long as the services are satis-

factorily performed. *Sides v. Duke University*, 74 N.C. App. 331, 328 S.E. 2d 818, *disc. rev. denied*, 314 N.C. 331, 333 S.E. 2d 490 (1985). In *Sides*, we recognized a claim for breach of an indefinite-term contract where the plaintiff alleged that she had moved from Michigan to Durham in reliance on promises that she would only be discharged for incompetence. *See also Fisher v. John L. Roper Lumber Co.*, 183 N.C. 486, 111 S.E. 857 (1922) (employee settled *bona fide* personal injury claim in exchange for employment "for the balance of his life"). *But see Malever v. Kay Jewelry Co.*, 223 N.C. 148, 25 S.E. 2d 436 (1943) (employee moved to Charlotte from Fayetteville on promise of permanent employment; no permanent obligation to employ). No additional consideration appears from this record. Plaintiff testified that he occasionally looked for other jobs, but never stated that he passed up other employment in reliance on defendant's promises. The basic contract was a contract terminable at will.

B

A basic contract of employment at will may also be supplemented by additional agreements, which themselves, if enforceable according to the law of contracts, may include terms restricting the employer's right to terminate at will. In *Roberts v. Mays Mills*, 184 N.C. 406, 114 S.E. 530 (1922), the employer offered in January 1920 to pay an additional 10% bonus at Christmas 1920 for employees employed continuously since January. Plaintiff was discharged without bonus pay in September. He sued, alleging that he had intended to quit in January but was induced to stay on by the bonus offer. The Supreme Court held that he was entitled to the bonus up to the time of discharge, although it did *not* hold that plaintiff was protected from the discharge itself. *See also Tuttle v. Kernersville Lumber Co.*, 263 N.C. 216, 139 S.E. 2d 249 (1964) (rejecting employee's contention that contract was for life). We again find no consideration from plaintiff to defendant which would make the Handbook a supplemental agreement or otherwise restrict defendant's right to terminate.

C

Plaintiff contends that even a general hiring for an indefinite term may only be terminated "in good faith," relying on language in *Malever v. Kay Jewelry Co., supra*. We note that the *Malever* court, although it could have grounded the concept of "good faith"

in business necessity (closing of store), did not do so. Rather, it relied simply on the general law regarding employment at will, suggesting a limited conception of "good faith." *See* G.S. 25-1-201(19) ("good faith" means honesty in fact). Even if we were to apply a more broad definition of "good faith," *see Jaudon v. Swink,* 51 N.C. App. 433, 276 S.E. 2d 511 (1981), we must conclude that defendant did not unconscionably take advantage of plaintiff. In *Jaudon* "good faith" prevented defendants from using the services, if proven, of plaintiff without paying the contract price. Here there is no allegation that plaintiff did not receive full pay for his services. Plaintiff contends simply that defendant did not fairly apply the Handbook Rules of Conduct even though the Rules' application was left to defendant's discretion.

### D

Plaintiff cites *dicta* in *Elmore v. Atlantic Coast Line R. Co.,* 191 N.C. 182, 131 S.E. 633 (1926), for the proposition that an employer may not feign dissatisfaction and dismiss an otherwise satisfactory employee at will. In *Elmore,* however, there was an employment contract which specifically stated that employees could not be discharged "without cause." The plaintiff there nevertheless proceeded on a tort theory.

We recognize the disparity of power in this type of situation and the potential for unfair results. However, we do not write on a clean slate. Applying the settled law of North Carolina, we must hold that plaintiff has shown no right to relief on his contract theory.

### V

[3] In *Sides v. Duke University, supra,* we recognized a major exception to the general rule that an indefinite contract of employment is terminable at will. Plaintiff in *Sides* alleged that defendant had discharged her in retaliation for her refusal to perjure herself or withhold information in a trial involving its medical staff. We held that she stated a valid claim in both contract and tort for wrongful discharge, on the grounds that the public policy requiring truthfulness before our courts outweighed the employer's freedom to discharge employees at will. We recognized there that the employer's power to terminate "at will" cannot be absolute, in view of the many other societal obligations shared by employers and employees.

Here plaintiff cites provisions of the Occupational Safety and Health Act of North Carolina, G.S. 95-126, that recognize employees' responsibility to help achieve safe working conditions and the role of employee initiative in safety matters. He argues that defendant's management personnel wrongfully discharged him in violation of this policy by firing him in retaliation for raising safety concerns. Defendant relies on *Dockery v. Lampart Table Co.*, 36 N.C. App. 293, 244 S.E. 2d 272, *disc. rev. denied*, 295 N.C. 465, 246 S.E. 2d 215 (1978), where we held that an employee at will has no action for retaliatory discharge. As we recognized in *Sides*, however, the General Assembly overruled *Dockery* on the specific question decided there, and the *Sides* court further eroded *Dockery*.

We hesitate however to establish a general cause of action for wrongful discharge for *any* employee discharged after raising safety concerns. Our decision in *Sides* rested on facts clearly showing a willful violation of the law and was consistent with other jurisdictions' insistence that the employer's conduct be in clear violation of express public policy to be actionable. *See Pierce v. Ortho Pharmaceutical Corp.*, 84 N.J. 58, 417 A. 2d 505, 12 A.L.R. 4th 520 (1980). We recognize that workplace safety is a major public issue. The legislature has worked to strike the proper balance between the employer's right to design and operate the workplace and the employee's right to work there free of threats to his or her life and health. We also recognize that some jobs are by their very nature dangerous, and that every safety concern raised by an employee cannot always be resolved to the satisfaction of all.

On the record before us, we believe that plaintiff failed to present a sufficient forecast of evidence to survive defendant's motion for summary judgment on this issue. In particular, the record before us contains no suggestion of the length of the interval between the time(s) when plaintiff raised safety concerns and his discharge. Even if they were all brought after the time when plaintiff became a senior electrician, the safety concerns nevertheless might predate plaintiff's discharge by as much as three years. By contrast, plaintiff in *Sides* was discharged within three months of the protected conduct, and had made protective requests for information in the interim. In addition, here plaintiff's own evidence showed that most of the safety concerns raised

were actually unpleasant working conditions about which little could be done and about which other workers had complained. Plaintiff presented no evidence from others who worked in the allegedly unsafe conditions and no evidence of state or federal safety requirements violated. Assuming *arguendo* that a cause of action exists as alleged, we conclude that plaintiff's forecast failed to establish it at the summary judgment stage.

## VI

Finally, plaintiff argues that defendant perpetrated fraud in representing to plaintiff and other employees that disciplinary actions would be governed by the Handbook. As discussed above, the Handbook did not become part of the contract of employment. Even if it had, its provisions allowed defendant discretionary disciplinary authority. Plaintiff cannot *legally* claim to have been misled by the Handbook, even though it would likely mislead one unschooled in the law of North Carolina.

## VII

Based on this record and the settled law of this State, we must conclude that the trial court correctly applied the law to the facts before it. Summary judgment for defendant is accordingly

Affirmed.

Judges JOHNSON and PARKER concur.