**Doris S. CROMER, Plaintiff,**

v.

**PERDUE FARMS, INC., Defendant.**

**Civ. No. 3:93CV00397.**

United States District Court,
M.D. North Carolina,
Rockingham Division.

Sept. 26, 1994.

---

Doris S. Cromer, Rockingham, NC, pro se.

Charles P. Roberts, III, Lucretia D. Smith, Haynsworth, Baldwin, Johnson and Greaves, P.A., Greensboro, NC, for defendant.

## MEMORANDUM OPINION

BULLOCK, Chief Judge.

This case comes before the court on a motion for summary judgment filed by Defendant Perdue Farms, Inc. Plaintiff seeks damages for (1) discrimination on the basis of race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e (1988) (Title VII), (2) wrongful discharge in violation of North Carolina public policy, (3) intentional infliction of emotional distress, and (4) breach of contract. Because Plaintiff has failed to produce evidence sufficient to support her claims, summary judgment will be granted for Defendant as to all of Plaintiff's claims.

### FACTS

In early 1991 Defendant employed Plaintiff as a licensed practical nurse to work the third shift at Defendant's Rockingham, North Carolina, poultry processing plant. Plaintiff was the first person to fill this newly created position of third-shift plant nurse and accepted an initial salary of $23,500.00 per year. Plaintiff and Defendant did not enter into any agreement as to the length of time for which Plaintiff would be employed. In her position Plaintiff was responsible for performing physicals for new employees, making sure certain employee medical records were updated, performing random drug tests, and attending to the medical needs of employees arising on her shift. In this last capacity Plaintiff would often examine and evaluate employees' injuries and make a recommendation to the particular employee's supervisor as to whether the employee needed to be placed on lighter duty as a result of the injury.

In the course of her employment, Plaintiff recommended that several employees be reassigned to a position of lighter duty or less repetition as a result of their injuries. Plaintiff's assignment of employees to lighter duty created conflict with the employees' supervisors who felt that Plaintiff was making too many such assignments to lighter jobs. Often the supervisors would refuse to reassign these employees. On more than one occasion Plaintiff argued with the supervisors about their refusal to follow her recommendations regarding lighter duty assignments. Plaintiff also complained to her immediate superiors, Mary Young[1] and Gilbert Gibson[2], about the supervisors' refusal to follow her recommendations regarding light duty assignment and about the arguments which Plaintiff and these supervisors had as a result. At no time during Plaintiff's employment with Defendant did Plaintiff otherwise complain to her superiors about any other aspect of her job, such as unsafe working conditions.

Beginning about November 3, 1991, Plaintiff began experiencing medical problems and was excused from work by her doctor for a cumulative total of about 2½ weeks in November. Plaintiff returned to work on November 27, 1991, and Plaintiff's last day of employment with Defendant was on or about January 3, 1992.

The parties are in dispute as to the facts concerning Plaintiff's employment termination. Plaintiff alleges that on December 12, 1991, Gibson informed Plaintiff that he

---

1. Mary Young was the head plant nurse at Perdue Farms in Rockingham, North Carolina, during Plaintiff's employment there.

2. Gilbert Gibson was the manager of Human Resources at Perdue Farms in Rockingham, North Carolina, during Plaintiff's employment there. Gibson interviewed and made the decision to hire Plaintiff in early 1991.

was accepting her resignation which Gibson claimed was tendered to him on November 5, 1991. Plaintiff alleges that, while she might have informed Gibson that she was *thinking* of resigning at the end of 1991, she at no time actually tendered her resignation to anyone. Plaintiff alleges that Defendant, through Gibson, unilaterally terminated her employment (under the guise of accepting Plaintiff's resignation) on December 12, 1991, to be effective January 3, 1992. Defendant's version of what transpired is substantially different. Defendant alleges that in late September or early October of 1991 Plaintiff talked with Young and Gibson about resigning her position but decided not to resign after speaking with Gibson. Defendant alleges that Plaintiff *did* tender her resignation to Gibson on or about November 5, 1991. Defendant further alleges that Plaintiff attempted to rescind her resignation on December 3, 1991, but that Gibson decided to accept her resignation on December 12, 1991, after conferring with Mary Young.[3] The reasons which Defendant gives for accepting Plaintiff's resignation include Plaintiff's ambivalence and non-commitment toward her work (as evidenced by twice having tendered her resignation) and the fact that Defendant had expended time and money to find a replacement for Plaintiff after her tender of resignation in early November.

After Plaintiff's employment with Perdue ended, the position of third-shift plant nurse was filled by a white female, Sharon Halton, who was given a salary of $26,000.00 per year. Defendant alleges that Halton was awarded a higher salary than Plaintiff because of her previous industrial nursing experience. Plaintiff had no such experience. After Halton's brief employment with Defendant, the third-shift plant nurse position was filled by a black female, Mary McIver, who was also given a salary of $26,000.00 per year. Defendant stated that the discrepancy between the starting salaries of Plaintiff and McIver was based upon McIver's previous experience in a poultry processing plant.

Plaintiff has admitted that at no time during her employment with Defendant was her race commented upon by any of Defendant's employees, nor was race given as a reason for her alleged termination. Defendant denies that race was a factor in any employment decision regarding Plaintiff's departure from Perdue. Plaintiff filed a charge of race discrimination with the EEOC on May 14, 1992, and later filed this lawsuit.

## DISCUSSION

■■■ Summary judgment shall be granted if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). The moving party bears the burden of persuasion on these issues. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The non-moving party may survive a motion for summary judgment by producing "evidence from which a jury might return a verdict in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). In considering the evidence, all reasonable inferences are to be drawn in favor of the non-moving party. *Id.* at 255, 106 S.Ct. at 2513–14.

### A. *Title VII Race Discrimination*

■■■ In cases such as this one, where there is an absence of direct evidence of discrimination, cases such as *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), set forth the allocation of burdens and order of presentation of proof in a Title VII case alleging race discrimination. The Supreme Court recently clarified this scheme of proof in *St. Mary's Honor Ctr. v. Hicks*, —— U.S. ——, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Plaintiff must first establish by a preponderance of the evidence a *prima facie* case of racial discrimination. *Burdine*, 450 U.S. at 252–53, 101 S.Ct. at 1093–94. To do this, Plaintiff need only prove (1) that she is black, (2) that she was qualified for the position of third-shift plant nurse, (3) that she was discharged from this position, and (4) that the

---

**3.** Defendant alleges that Plaintiff specified high blood pressure and the difficulty Plaintiff was experiencing with the employee supervisors as the reasons for her resignation.

position remained open and was ultimately filled by a white person of the same qualifications as Plaintiff. *See St. Mary's,* —— U.S. at ——, 113 S.Ct. at 2747; *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824. It is uncontroverted that Plaintiff is a black person and that her replacement was a white person. In light of the fact that Plaintiff is proceeding *pro se* and that all reasonable inferences in a motion for summary judgment are to be drawn in favor of the nonmoving party, the court also finds that Plaintiff has satisfied her burden of coming forward with evidence to show that she was qualified for the position of third-shift plant nurse and was replaced by a person of similar qualifications. (Cromer Aff. ¶ 12, filed June 6, 1994). Furthermore, since the facts are in dispute regarding whether Plaintiff was discharged or resigned, for the purpose of this motion the Plaintiff's version of the facts, that she was discharged, is assumed to be true. *Computer Servicenters, Inc. v. Beacon Mfg. Co.,* 443 F.2d 906, 906–07 (4th Cir. 1971). The court therefore finds that Plaintiff has established a *prima facie* case of discrimination under the *McDonnell Douglas* scheme.

■ Once the plaintiff in a race discrimination case presents a *prima facie* case of race discrimination, the defendant must carry the burden of producing evidence that the adverse employment action was taken "for a legitimate, nondiscriminatory reason." *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094. In order to do this, " 'the defendant must clearly set forth, through the introduction of admissible evidence,' reasons for its actions which, *if believed by the trier of fact,* would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's,* —— U.S. at ——, 113 S.Ct. at 2747 (quoting *Burdine,* 450 U.S. at 254–55, 101 S.Ct. at 1094–95). Defendants in this case have rebutted the *prima facie* case of discrimination by producing evidence that the

employment action alleged to be adverse to Plaintiff was taken because Plaintiff was "so ambivalent about her employment" with Defendant (Gilbert Aff. ¶ 11, filed Apr. 11, 1994) and could not be depended upon for the job of third-shift plant nurse.[4] (Young Aff. ¶ 6, filed Apr. 11, 1994).

■ Since Defendant has succeeded in carrying its burden of production, the *McDonnell Douglas* presumption of discrimination evaporates and the Plaintiff must prove that the Defendant intentionally discriminated against her because of her race. *U.S. Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983). When a defendant has carried its burden of producing a non-discriminatory reason for an adverse employment action, the plaintiff may prove intentional discrimination by showing *"both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's,* —— U.S. at ——, 113 S.Ct. at 2752. In this case, Plaintiff has not proffered any evidence showing that the reasons given by Defendant for the adverse employment decision were false, nor has she proffered any evidence to show that discrimination was the real reason for Defendant's actions. In other words, Plaintiff has failed to point to any evidence of intentional racial discrimination against her.

■ Plaintiff admits that no one at Perdue ever made any sort of comment to her that she perceived as being racial. (Cromer Dep. of Oct. 26, 1993, p. 90). Moreover, the *only* reasons Plaintiff gives for believing that she was the victim of racial discrimination are (1) she was the first black nurse at Perdue, (2) she believes she was fired and did not resign, (3) they hired a white person to replace her who was paid a higher salary than Plaintiff. (Cromer Dep. of Oct. 26, 1993, pp. 90–91). When, as here, the inference sought to be drawn from Plaintiff's evi-

---

4. While Defendant's justification for the adverse employment action is based upon the disputed fact that Plaintiff had a history of offering and then rescinding her resignation, "[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Burdine,* 450 U.S. at 254–55, 101 S.Ct. at 1094–95 (citation omitted). Moreover, Plaintiff's undisputed and frequent absence from work during the month of November 1991 supports Defendant's allegation that Plaintiff could not be counted on to perform the duties of her job.

dence "lacks substantial probability" but is based upon "surmise and conjecture" that issue should not be submitted to the jury for consideration. *Lovelace v. Sherwin–Williams Co.*, 681 F.2d 230, 242 (4th Cir. 1982). This circumstantial evidence presented by Plaintiff does not support as a reasonable probability the inference that but for her race she would not have been subject to an adverse employment decision. For this reason alone it is proper to grant Defendant's motion for summary judgment as to Plaintiff's Title VII claim.

 In addition to the foregoing, Plaintiff admits that she interviewed with Gibson for the position of third-shift plant nurse and was ultimately offered this position by Gibson. (Cromer Dep. of Oct. 26, 1993, pp. 37–45). Plaintiff also admits that it was Gibson who made the decision to end her employment with Defendant. (Cromer Dep. of Oct. 26, 1993, pp. 85–87). Plaintiff was offered her position with Defendant on or about April 23, 1991, and the decision to terminate Plaintiff's employment was made on or about December 12, 1991. Consequently, "in cases where the hirer and the firer are the same individual and the termination of employment occurs within a relatively short time span following the hiring, a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer." *Proud v. Stone*, 945 F.2d 796, 797 (4th Cir.1991). Apart from sheer speculation, Plaintiff has not presented any countervailing evidence to show she was intentionally discriminated against. Therefore,

summary judgment shall be entered for Defendant on Plaintiff's Title VII claim.

### B. *Wrongful Discharge*

 Plaintiff asserts a cause of action for wrongful discharge in violation of North Carolina public policy.[5] Plaintiff's claim for wrongful discharge fails for at least two reasons. First of all, Plaintiff has not demonstrated a violation of law or of any public policy articulated by the North Carolina courts or legislature.[6] Second, Plaintiff has failed to produce any evidence showing a causal nexus between any protected activity and her subsequent termination. A *prima facie* case of retaliation requires a plaintiff to show by a preponderance of the evidence that the adverse employment action would not have occurred but for the protected conduct. *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365–66 (4th Cir.1985). *See also Hogan v. Forsyth Country Club Co.*, 79 N.C.App. 483, 499, 340 S.E.2d 116, 126 (1986). For these reasons, summary judgment must be entered for Defendant as to Plaintiff's claim for wrongful discharge in violation of public policy.

### C. *Infliction of Emotional Distress*

 Plaintiff has also brought a claim against Defendant for intentional infliction of emotional distress. In order to prevail on this claim, Plaintiff must show: "(1) extreme and outrageous conduct, (2) which is intended to cause and does cause (3) severe emotional

---

5. Plaintiff in her deposition manifests a belief that she brought her claim of wrongful discharge not because she believed that her complaints caused her discharge but because "people do not like that word discrimination, so [she] reworded it for wrongful discharge." (Cromer Dep. of Feb. 22, 1994, p. 8).

6. The North Carolina Supreme Court has stated that "the definition of 'public policy' ... does not include a laundry list of what is or is not 'injurious to the public or against the public good'" and has chosen to allow this area of the law to "mature slowly." *Amos v. Oakdale Knitting Co.*, 331 N.C. 348, 353 & n. 1, 416 S.E.2d 166, 169 & n. 1 (1992). Plaintiff appears to make the argument that her employment may have been terminated because of her complaining to Gibson about "unsafe working conditions" based upon her complaints to Gibson that the employees'

supervisors would not follow her instructions as to the care of plant employees. (Cromer Dep. of Oct. 26, 1993, p. 60; Cromer Dep. of Feb. 26, 1994, pp. 21–28). The tenuity of this argument, in addition to the fact that North Carolina has never recognized a cause of action for wrongful discharge in favor of employees who orally complained to their employers about unsafe working conditions, precludes Plaintiff's cause of action for wrongful discharge. Plaintiff admits that she did not initiate a complaint with the Occupational Safety and Health Review Commission or threaten to initiate any such complaint. Therefore North Carolina General Statute Section 95–241, prohibiting discrimination on account of any activity protected under the Occupational Safety and Health Act of 1970, 29 U.S.C. §§ 651–678, is not applicable to protect Plaintiff.

distress to another." *Dickens v. Puryear,* 302 N.C. 437, 452, 276 S.E.2d 325, 335 (1981). Whether the conduct complained of may reasonably be found to be extreme and outrageous is a question of law for the court. *Wilson v. Bellamy,* 105 N.C.App. 446, 468, 414 S.E.2d 347, 359 (1992). In order to be considered "extreme and outrageous," the conduct must be " 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' " *Hogan v. Forsyth Country Club Co.,* 79 N.C.App. 483, 493, 340 S.E.2d 116, 123 (1986) (quoting *Restatement (Second) of Torts* § 46 comment (d) (1965)). The conduct Plaintiff has complained of in this case does not reach this level of atrocity. The conduct that Plaintiff complains of in regard to her emotional distress claim consists merely of (1) Defendant's termination of her employment, and (2) Defendant's action in subpoenaing her employment records from a subsequent employer. The court finds that Defendant's conduct in terminating Plaintiff's employment was not "extreme and outrageous." *See McKnight v. Simpson's Beauty Supply, Inc.,* 86 N.C.App. 451, 454, 358 S.E.2d 107, 109 (1987) (holding that the fact that defendant's discharge of plaintiff was abrupt, without cause, and unexplained was not enough to support a claim for intentional infliction of emotional distress). Furthermore, the court finds that it was not considered extreme and outrageous conduct for Defendant, after the institution of this lawsuit by Plaintiff, to subpoena Plaintiff's employment records from a subsequent employer for the purposes of defending against Plaintiff's lawsuit.

 ■ Neither has Plaintiff offered any evidence that Defendant's conduct has caused her severe emotional distress. The emotional and physical ailments of which Plaintiff complains are (1) stress, (2) heart palpitations, and (3) diabetes. Plaintiff's "stress" does not rise to the level of "severe emotional distress," which has been interpreted to mean " 'any emotional or mental disorder, such as, for example, neurosis, psychosis, chronic depression, phobia, or any other type of *severe and disabling* emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so.' " *Waddle v. Sparks,* 331 N.C. 73, 83, 414 S.E.2d 22, 27 (1992) (quoting *Johnson v. Ruark Obstetrics & Gynecology Ass'n,* 327 N.C. 283, 304, 395 S.E.2d 85, 97, *reh'g denied,* 327 N.C. 644, 399 S.E.2d 133 (1990)). As to the cause of Plaintiff's heart palpitations, Plaintiff has admitted that they were the result of her high blood pressure. (Cromer Dep. of Feb. 22, 1994, p. 9). Furthermore, while Plaintiff claims that her diabetes was caused by stress attributable to Defendant's actions, Plaintiff admits that her doctor has been unable to tell her that her diabetes was caused by such stress. (Cromer Dep. of Feb. 22, 1994, p. 10). For the above reasons, summary judgment shall be granted in favor of Defendant on Plaintiff's claim for intentional infliction of emotional distress.

### D. *Breach of Contract*

 ■ Plaintiff's final cause of action is one for breach of contract against Defendant. While Plaintiff admits that she had no written employment contract with Defendant, Plaintiff states that she was of the understanding that after thirty days "the job was [hers] until [she] gave it up ... if nothing happened between the thirty days." (Cromer Dep. of Feb. 22, 1994, p. 14). It is clear under North Carolina law that a contract of employment which does not contain a specified term or fixed duration of employment is ordinarily not enforceable. *Still v. Lance,* 279 N.C. 254, 259, 182 S.E.2d 403, 406 (1971). Plaintiff admits that any employment contract between herself and Defendant did not contain a fixed term of employment. (Cromer Dep. of Feb. 22, 1994, pp. 14–16). Therefore, the contract could legally be terminated at any time by Defendant. *Still,* 279 N.C. at 259, 182 S.E.2d at 406.

 ■ Plaintiff also bases her breach of contract cause of action upon unspecified language contained in Defendant's employment handbook, which Plaintiff received at the commencement of her employment. The law of North Carolina is clear that "unilaterally promulgated employment manuals or policies do not become part of the employment con-

tract unless expressly included in it." *Walker v. Westinghouse Elec. Corp.*, 77 N.C.App. 253, 259, 335 S.E.2d 79, 83–84 (1985) (citations omitted). *See also Roberts v. Wake Forest Univ.*, 55 N.C.App. 430, 436, 286 S.E.2d 120, 124 (1982) (holding that there was no employment contract where personnel manual provided that after three months an employee became a "permanent employee," where there was no additional expression as to duration).[7] Accordingly, Defendant is entitled to summary judgment on Plaintiff's cause of action for breach of contract.

### E. *Defendant's Motion to Strike Plaintiff's Pleadings and Assess Sanctions*

In response to Defendant's motion for summary judgment, Plaintiff has submitted to the court for review approximately 150 unverified and unauthenticated documents. In light of the court's disposition of this case and the irrelevant nature of the vast majority of these documents, the court finds it unnecessary to rule on Defendant's motion to strike Plaintiff's pleadings.

Defendant has also moved for sanctions against Plaintiff on the grounds that Plaintiff failed to respond fully to Defendant's discovery requests and allegedly gave false answers during her deposition testimony. In light of Plaintiff's status as a *pro se* litigant, and the fact that Plaintiff's conduct may have been inadvertent, the court finds it inappropriate to assess sanctions against Plaintiff.

**CONCLUSION**

Plaintiff has failed to establish a claim of discrimination based upon her race. Plaintiff has not established a claim for wrongful discharge in violation of public policy, intentional infliction of emotional distress, nor breach of contract. Summary judgment will therefore be granted for Defendant on all of Plaintiff's claims.

---

**7.** Moreover, the employment handbook on which Plaintiff apparently bases her breach of contract cause of action contains the following language:

> These handbook contents are not intended to create a contract between the company and any employee. Nothing in this handbook binds the company or any employee to any specific procedures, policies, benefits, working conditions, or privileges of employment.
>
> As an employee, you are completely free to leave the company at any time you choose, and the company has the same rights in the employment relationship. This is just good business practice for everyone.
>
> No supervisor, or member of management, except for the company's chief executive offi-

cer, has the authority to bind the company to any employment contract for any specified period of time with any employee, either verbally or in writing. The only valid contract for employment between the company and any employee must be in writing and signed by the chief executive officer.

When Plaintiff received a copy of the handbook at the commencement of her employment she signed an acknowledgment stating that she had read the handbook and that she understood that "the handbook did [not guarantee her] any specific policies, procedures, rules, or length of employment."