**William MARIANI, Plaintiff,**

v.

**CITY OF PITTSBURGH, a municipal corporation, Officer Preik and Officer Pupinski, as individuals, and in their official capacity as members of the Police Force of the City of Pittsburgh, Defendants.**

Civ. A. No. 83–2991.

United States District Court,
W.D. Pennsylvania.

Jan. 3, 1986.

Raymond Radakovich, Pittsburgh, Pa., for plaintiff.

Zan I. Hodzic, Asst. City Sol., D.R. Pellegrini, City Sol., Bryan Campbell, Pittsburgh, Pa., for defendants.

## OPINION

COHILL, Chief Judge.

Presently before us is a Motion for Summary Judgment filed on behalf of Defendant the City of Pittsburgh ("City"). The Complaint charges both the City and two individual police officers with violating 42 U.S.C. § 1983 (1982) by depriving Plaintiff of his fourteenth amendment rights.

*Background*

The above captioned action arises out of a series of events beginning on the evening of April 9, 1983 and ending early the following morning. Shortly after a rock concert had ended at a downtown theater, Cynthia Dietrich, a police officer who was directing heavy pedestrian traffic at a major intersection, observed the Plaintiff. She reported that an individual fitting Plaintiff's description, and driving a black Camaro, had disregarded her signals, accelerated into the intersection toward her, and then swerved away just barely missing her. A number of pedestrians were forced to run out of the intersection to avoid being hit. Dep., p. 10.

Dietrich gave a description of the car, including its license plate and a description of the driver to an officer at police headquarters. Her descriptions, along with her version of the incident, to the effect that the driver had almost run over several people, were broadcast over the police radio. *Id.*, at 13.

At approximately one o'clock in the morning, Officers Preik and Papinski, the individual Defendants in this action, spotted the vehicle described. It was parked and unoccupied. Pupinski Dep., p. 5. The officers reported that they had found the vehicle and requested assistance. A short time later, the officers observed the Plaintiff approaching the vehicle. Plaintiff

matched the description of the individual involved in the earlier incident. *Id.*, at 9.

According to the officers, they initially attempted to stop the Plaintiff to obtain identification. However, when Plaintiff spotted the officers, he entered his vehicle and attempted to drive away. Preik Dep., p. 9. Aided by two other officers who had responded to their call, Officers Preik and Pupinski blocked Plaintiff's vehicle with a patrol car and a van. *Id.*, at 13.

Approaching Plaintiff's vehicle from the rear, Officers Preik and Pupinski requested that Plaintiff step out of his vehicle. *Id.*, at 11. When Plaintiff did not voluntarily exit his vehicle, the officers forcibly removed him. According to the officers, Plaintiff resisted arrest, punching and kicking at them from the moment they removed him from his vehicle until he was handcuffed and placed in the van. Pupinski Dep., p. 8.

After the struggle, the officers noticed some blood on Plaintiff's hair. Believing that Plaintiff may have injured his head during his resistance, the officers stopped at a hospital before taking Plaintiff to the police station. Preik Dep., p. 30. Both officers deny using a night stick, punching or kicking Plaintiff to subdue him. *Id.*, at 17–20. Pupinski Dep., p. 12. According to the officers, Plaintiff's head wound did not require sutures and Plaintiff had suffered no other injury.

During his arrest, Officer Pupinski smelled alcohol on Plaintiff's breath. Later, at the police station, he observed Plaintiff walking with a staggered gait. Pupinski Dep., p. 8. Consequently, a breath analysis was administered, the results of which indicated that Plaintiff was legally intoxicated. Plaintiff subsequently pled guilty to a charge of underage drinking and a drunk driving charge against him was dismissed.

William Mariani, Plaintiff, states a different version of the circumstances surrounding his arrest. He claims that sometime around two o'clock in the morning, after his father's bar had closed, he went outside to retrieve his wallet from his car. Mariani

Dep., p. 48. He conversed briefly with some men who had noticed a number of police cars on the street, then he proceeded to enter his car. *Id.*, at 49–50. Immediately upon his entering the car, several police cars with their lights flashing blocked in his car and demanded that he get out of it. *Id.* Three or four policemen, night sticks drawn, approached his car, opened the door, dragged him out and began to beat him and shout obscenities at him. They allegedly accused him of being a cop killer. Plaintiff claims that he was thrown up against his car several times and then handcuffed. *Id.*, at 52.

Plaintiff also disagrees with the officers' story in several other respects. He disputes the fact that his head injury did not require stitches, stating instead that the officers talked the nurse out of giving him one or two stitches. *Id.*, at 11. At the police station, Plaintiff claims that the officers threatened him with revenge for attempting to kill a police officer. *Id.*, at 55. Plaintiff denies that he attempted to run down the traffic officer. Rather, he claims that he simply disobeyed her order to stop because he was sick of being in traffic. *Id.*, at 43.

Officers Preik and Pupinski deny Plaintiff's allegations that they maliciously assaulted him and used unnecessary force in making his arrest. On the contrary, the officers maintain that Plaintiff's behavior during the arrest constitutes intentional assault and battery against them. They have filed a counterclaim to that effect.

*Summary Judgment*

The City files this Motion for Summary Judgment on the grounds that, given either version of the facts, Plaintiff has failed to establish a basis for municipal liability under § 1983. When considering a motion for summary judgment, the Court, viewing the facts in the light most favorable to the nonmoving party, must determine if there are any genuine issues of material facts. Fed.R.Civ.P. 56. *Myer v. Riegel Products Corp.*, 720 F.2d 303 (3d Cir.1983), *cert. denied*, 465 U.S. 1091, 104 S.Ct. 2144, 79

L.Ed.2d 910 (1984); *Betz Laboratories Inc. v. Hines,* 647 F.2d 402 (3d Cir.1981). The moving party has the burden of proving that no genuine issue exists. *Adickes v. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1969); *Butz v. Hertz Corp.,* 554 F.Supp. 1178, 1181 (W.D. Pa.1983). Any doubts must be resolved in favor of the nonmoving party. *Gans v. Mundy,* 762 F.2d 338, 341 (3d Cir.1985) (quoting *Ness v. Marshall,* 660 F.2d 517, 519 (3d Cir.1981)).

*Municipal Liability*

■ A municipality can not be liable under § 1983 solely on the basis of respondeat superior. Thus, no liability arises for failure to control the conduct of an officer. However, a municipality can be held liable under § 1983 when "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation or decision officially adopted and promulgated by that body's officers." *Monell v. Department of Social Services of New York,* 436 U.S. 658, 690, 98 S.Ct. 2018, 2035, 56 L.Ed.2d 611 (1978).

■ In order to establish municipal liability under § 1983, a plaintiff must: 1) identify the challenged policy or custom, 2) attribute it to the city, and 3) show a causal connection between the execution of that policy and the injury suffered. *Kranson v. Valley Crest Nursing Home,* 755 F.2d 46, 51 (3d Cir.1985) (quoting *Losch v. Borough of Parkesburg,* 736 F.2d 903, 910 (3d Cir. 1984)). *See City of Oklahoma City v. Tuttle,* —— U.S. ——, 105 S.Ct. 2427, 2439, 85 L.Ed.2d 791, 807 (Brennan, J., concurring); *Gilmere v. City of Atlanta,* 774 F.2d 1495, 1512 (11th Cir.1985) (en banc) (Johnson, J.); *Strauss v. City of Chicago,* 760 F.2d 765, 767 (7th Cir.1985).

■ A policy or custom is a "course of action consciously chosen from among various alternatives." *Tuttle,* 105 S.Ct. at 2436, (Rehnquist, J., Plurality). Technically, the term "policy" denotes something which has been officially adopted, while the term "custom" denotes a practice which is so widespread, well settled and permanent, that it rises to the level of law. *Gilmere,*

774 F.2d at 1504, 1512 (citing *Monell,* 436 U.S. at 690–91, 98 S.Ct. at 2035–36); *Webster v. City of Houston,* 735 F.2d 838, 841 (5th Cir.) (per curiam), *reh'g en banc denied,* 739 F.2d 993 (1984).

■ A policy or custom can be inferred from acts or omissions if they constitute tacit approval or deliberate indifference to unconstitutional conduct. *See, e.g., Estate of Bailey v. County of York,* 768 F.2d 503, 506 (3d Cir.1985) (quoting *Turpin v. Mailet,* 619 F.2d 196, 200 (2d Cir.), *cert. denied,* 449 U.S. 1016, 101 S.Ct. 577, 66 L.Ed.2d 475 (1980)); *Wellington v. Daniels,* 717 F.2d 932, 935–36 (4th Cir.1983); *Hays v. Jefferson Co.,* 668 F.2d 869, 873–74, *reh'g denied,* 673 F.2d 152 (1982), *cert. denied,* 459 U.S. 833, 103 S.Ct. 75, 74 L.Ed.2d 73 (1983); *Herrera v. Valentine,* 653 F.2d 1220, 1224 (8th Cir.1981). Whether municipal action or inaction amounts to authorization, approval or encouragement is generally a question of fact. *Estate of Bailey,* 768 F.2d at 506.

■ Once the existence of a policy has been established and attributed to the municipality, the Plaintiff must show a plausible nexus between the execution of that policy and the constitutional rights violated. *Estate of Bailey,* 768 F.2d at 507. In other words, to sustain his burden, Plaintiff must develop facts which demonstrate an "affirmative link" between the misconduct of the individual officer and some policy, express or implied, which has been adopted or authorized by the City. *Rizzo v. Goode,* 423 U.S. 362, 371, 96 S.Ct. 598, 604, 46 L.Ed.2d 561 (1976). See *Tuttle,* 105 S.Ct. at 2436. The official policy must be the "moving force" behind the constitutional violation. *Monell,* 436 U.S. at 694, 98 S.Ct. at 2037; *Black v. Stevens,* 662 F.2d 181, 189 (3d Cir.1981), *cert. denied,* 455 U.S. 1008, 102 S.Ct. 1646, 71 L.Ed.2d 876 (1982), *reh'g denied,* 456 U.S. 950, 102 S.Ct 2022, 72 L.Ed.2d 475.

In the case *sub judice,* Plaintiff alleges that, through gross negligence and deliberate indifference to Plaintiff's constitutional rights, the city has adopted by implication

customs or policies of failure to properly train or control its police officers and condoning the use of excessive force by repeatedly refusing to discipline the two individual Defendants and by knowingly retaining dangerous persons on the police force.

*Failure to Train*

Plaintiff alleges that the City has a custom or policy of failing to train its officers but offers no evidence whatsoever on what training, if any, each of the officers in question received. The only evidence contained in the record regarding training pertains to supplemental training after an officer has had a complaint filed against him with internal affairs. Both officers Preik and Pupinski stated that after a complaint had been filed against them they had not been called in by their superiors for instruction on the appropriate procedure to follow should a similar incident occur in the future. Preik Dep. at 23, 29; Pupinski Dep. at pp 13–14.

In its recent decision in *City of Oklahoma City v. Tuttle,* the Supreme Court distinguished *Monell,* where the challenged policy was in and of itself unconstitutional, from instances where the policy relied on is more nebulous and further removed from a constitutional violation. 105 S.Ct. at 2436–37. The policy alleged in *Tuttle* was that of inadequate training and supervision of police officers. The court noted that, if such a policy, which is not itself unconstitutional, could ever be proven, the Plaintiff would have to provide "considerably more proof than a single incident." *Id.,* at 2436. Even assuming that inadequate training could ever be a policy under *Monell,* the Court reserved the issue of whether gross negligence could satisfy the "moving force" requirement or whether a more conscious decision on the part of the city would be required. *Id.,* at n. 7.

Although *Tuttle* does not directly answer the situation presented in this action, it does express a requirement for greater proof where the policy alleged is not itself unconstitutional. Since *Tuttle,* several courts have considered cases where the Plaintiff has alleged a policy of inadequate training. *See, e.g., Rymer v. Davis,* 775 F.2d 389 (6th Cir.1985); *Gilmere v. City of Atlanta,* 774 F.2d 1495 (11th Cir.1985) (en banc); *Vippolis v. Village of Haverstraw,* 768 F.2d 40 (2d Cir.1985); *Grandstaff v. City of Borger,* 767 F.2d 161 (5th Cir.1985). With the exception of *Rymer,* each court has placed a heavy, if not insurmountable, burden on a Plaintiff attempting to prove such a policy. In *Rymer,* the Court of Appeals for the Sixth Circuit reaffirmed its earlier decision which the Supreme Court had vacated and remanded for reconsideration in light of its decision in *Tuttle.* In reaffirming its earlier decision at 754 F.2d 198, the court noted that it had not relied on a single incident. Rather, it had based that decision on the City's complete lack of pre-employment training and failure to ever instruct its officers on proper arrest procedures or treatment of persons injured during arrest. 775 F.2d at 757.

*Rymer* presents an extreme situation. The more typical fact pattern was considered by the Court of Appeals for the Second Circuit in *Vippolis.* The Plaintiff in *Vippolis,* as in the present action, made no effort to establish what training the officer in question did receive or what further training he should have received. 768 F.2d at 44–45. Applying *Tuttle,* the court found that proof that a municipality had hired an officer, knowing that he had not completed the training program required by state law, was insufficient alone to show causation. In order to prove a causal connection, the Plaintiff must show that specific deficiencies in the training the officer received led to the incident of alleged misconduct. *Id.* In *Vippolis,* but even more so in the present action, the Plaintiff has not only failed to state any genuine issue as to causation, but also has failed to allege any facts to support his claim that the officers had in fact been inadequately trained.

*Excessive Force*

Plaintiff states two related theories as the basis for his claim that the City had a policy or custom of condoning the use of

excessive force: 1) repeatedly refusing to discipline the two officers in question, 2) retaining those officers on the police force knowing that they are dangerous. In support of both theories, Plaintiff relies on one prior complaint of brutality filed with Internal Affairs against each officer. In each case, the officer involved was interviewed by Internal Affairs but was never disciplined as a result of the complaint. Preik Dep. at pp 22–23; Pupinski Dep. p. 13. Neither officer has ever had a complaint filed against him with his supervisor.

The Internal Affairs complaint filed against Officer Pupinski, although it involves allegations of use of excessive force, is factually very different from the incident upon which Plaintiff's action is based. The earlier incident occurred while Officer Pupinski was guarding a prisoner already in custody. When four of the prisoner's relatives attempted to help him leave the hospital in which he was being treated for a prior injury, Officer Pupinski had to physically restrain the man. Pupinski Dep., p. 15.

Plaintiff has not offered any further details regarding either complaint, nor has he offered any information generally about the City's record of following up on complaints alleging use of excessive force on other officers who may have been disciplined for such behavior. Since we have no indication of what, if any, information or testimony was received in addition to the officer's own report or what action was taken on the previous complaints filed against Officers Preik and Pupinski, it is impossible to determine whether the officers were in fact guilty of using excessive force in those instances. Likewise, it is impossible to determine whether the City can be said to have tacitly condoned whatever did occur without information on how these complaints were processed and resolved.

■ Prior incidents of abusive behavior can establish a policy or custom if Plaintiff presents evidence showing that the City has acceded to that behavior. *See, e.g. Herrera v. Valentine*, 653 F.2d 1220, 1224

(8th Cir.1981) (40 separate instances of police misconduct brought to attention of supervisor during public hearing but no subsequent action taken by supervisors). However, proving that the prior incidents and the present alleged misconduct occurred, let alone that the city acceded to that misconduct, can be difficult. *Grandstaff*, 767 F.2d at 171 (citing *Bennett v. City of Slidell*, 728 F.2d 762 (5th Cir.1984) (en banc)).

■ Isolated events will not establish a pattern of abusive behavior. *Ramie v. City of Hedwig Village*, 765 F.2d 490, 493–94 (5th Cir.1985). *See also, Voutour v. Vitale*, 761 F.2d 812, 820 (1st Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 879, 88 L.Ed.2d 916 (1985); *Languirand v. Hayden*, 717 F.2d 220, 229 (5th Cir. 1983), *cert. denied*, 467 U.S. 1215, 104 S.Ct. 2656, 81 L.Ed.2d 363 (1984); *Berry v. McLemore*, 670 F.2d 30, 32 (5th Cir.1982). Neither will mere recitation of the number of complaints filed suffice to prove a policy or custom. A plaintiff must show why those prior incidents deserved discipline and how the misconduct in those cases is similar to that involved in the present action. *Strauss v. City of Chicago*, 760 F.2d 765, 769 (7th Cir.1985) (requiring that facts indicating a policy or custom appear in the complaint). *But see, Payne v. City of La-Salle*, 610 F.Supp. 607, 609 (N.D.Ill.1985) (following *Strauss* but criticizing its holding as placing plaintiffs in a proverbial catch 22 situation).

The Plaintiff in this action alleges that the officers in question used excessive force during his arrest and on two previous occasions, one of which did not involve an arrest. He does not allege any facts indicating that the prior incidents actually involved use of excessive force or that the City failed to thoroughly investigate those complaints. Both officers Pupinski and Preik state that they were required to respond to Internal Affairs about the incidents raised in the Complaints. Allowing an inference that, because neither officer received discipline as a result of his only

prior complaint, the City has tacitly authorized the use of excessive force would be absurd. Certainly, we can not assume that each complaint filed by an individual who has been arrested against his will presents a valid allegation of police misconduct. Likewise, we can not conclude that two previous complaints alleging use of excessive force represent the type of widespread abuse contemplated in *Monell.* 436 U.S. at 690–91, 98 S.Ct. at 2035–36.

For the record, we note that the Court of Appeals for the Third Circuit has recognized liability under § 1983 for a policy of encouraging use of excessive force by police officers. In *Black v. Stephens,* 662 F.2d 181 (3d Cir.1981), *cert. denied,* 455 U.S. 1008, 102 S.Ct. 1646, 71 L.Ed.2d 876 (1982), *reh'g denied,* 456 U.S. 950, 102 S.Ct. 2022, 72 L.Ed.2d 475 (1982), the majority upheld a jury verdict against the police chief and the City but conceded that the evidence was not overwhelming. 662 F.2d at 189–90. The court relied primarily on the promulgation of a regulation which it believed encouraged officers to use excessive force and a policy which insured that no citizens' complaints would ever be placed in an officer's personal file. *Id.* As pointed out by the dissenting opinion, the majority recognized that use of excessive force could not be shown by insolated incidents. *Id.* at 199 (Garth, J). Thus, the majority mentions only in a footnote that the officer in question had two previous abusive behavior complaints which apparently had gone uninvestigated. *Id.,* at 191 n. 9. We believe *Black* supports rather than contradicts our holding in the present case.

*Conclusion*

■ Viewing the facts before us in the light most favorable to the Plaintiff, we see no genuine issues regarding the establishment of a permanent and well settled policy or custom under which the city can be held liable for violating § 1983. Thus, summary judgment will be entered in favor of City in the above-captioned action.