**George RUPINSKY, Plaintiff,**

v.

**MILLER BREWING COMPANY,**
**subsidiary of Philip Morris,**
**Inc., Defendant.**

**Civ. A. No. 83–3167.**

United States District Court,
W.D. Pennsylvania.

Jan. 16, 1986.

Raymond Radakovich, Pittsburgh, Pa., for plaintiff.

John P. Edgar, Pittsburgh, Pa., Robert Heim, Philadelphia, Pa., for defendant.

## OPINION

COHILL, Chief Judge.

This case is before us on Defendant's Motion for Summary Judgment. The basis of the motion is that Plaintiff has no cause of action against Defendant arising out of his termination because he was an at-will employee, and, that consequently, Plaintiff has failed to state a claim against Defendant for which relief can be granted. After careful consideration of the briefs filed and the relevant law, we will grant Defendant's motion.

*Facts and Procedural History*

Plaintiff, George Rupinsky, is a citizen of Ohio. Defendant, Miller Brewing Co., a Wisconsin corporation with its principal place of business in Wisconsin, is a subsidiary of Philip Morris, Inc., a Virginia corporation, with its principal place of business in New York. Therefore, diversity of citizenship is proper under 28 U.S.C. §§ 1332, 1441.

On February 19, 1978, while he was employed by Pepsi-Cola Company in Pittsburgh, Pennsylvania, Plaintiff read an employment opportunity advertisement in the Pittsburgh Press which was placed by the Defendant, Miller Brewing Company. Plaintiff responded by sending a letter and resume to Miller, expressing his interest in working for Miller. Rupinsky Dep., pp. 8–9. Shortly thereafter, Miller telephoned Plaintiff, conducted a preliminary interview over the phone, and arranged for Plaintiff to interview at its plant in Eden, North Carolina, completely at Miller's expense. *Id.* at 9–10.

Upon arriving at the Miller Brewing Company facility, Plaintiff went through four separate interviews and signed an employment application. *Id.* at 13. Included in said application was a paragraph which stated that "[t]hese agreements do not, of course, bind either party to any specific period of employment." *Id.* at 19–20, 31; Dep.Ex. 2.

Following his interviews, by letter dated March 24, 1978, Plaintiff was formally offered a position with Miller Brewing Co. at its Eden, North Carolina facility as an inventory systems coordinator. Dep.Ex. 3. Plaintiff accepted this offer in a letter dated March 27, 1978. Dep.Ex. 4. Defendant paid for all of Plaintiff's relocation expenses in order for him to begin work in Eden on April 10, 1978.

Plaintiff worked at Miller for two-and-one-half years; first as an inventory systems coordinator, and was later promoted to warehouse supervisor. Dep., pp. 40–41. However, Plaintiff received a below average performance appraisal in this new position in June of 1980. *Id.* at 49–50; Dep.Ex. 6. Six months later, on December 10, 1980, Plaintiff was discharged from Miller. Dep., pp. 52–53.

After his termination from Miller, Plaintiff received severance pay equal to his base salary of five hundred ($500.00) dollars a week for at least eight weeks. *Id.* at 74. Immediately following the expiration

of these payments, Plaintiff received thirteen (13) weeks of unemployment compensation benefits totaling $1,807.00 ($135.00 a week). *Id.* Plaintiff received these benefits from February, 1981 until May 26, 1981, at which time he acquired new employment with Packard Electric in Warren, Ohio, where he is presently employed.

■ In this wrongful discharge action, Plaintiff is seeking to recover damages for the termination of his employment by Miller Brewing Company. Plaintiff's complaint, which sounds in tort and contract, was initially filed in state court and then removed to this court by the Defendant pursuant to 28 U.S.C. § 1441. At the outset, we must determine which forum's law governs the instant case. Plaintiff argues that the law of Pennsylvania is controlling while Defendant argues that the law of North Carolina is applicable.

As a federal court sitting in a diversity case, we are bound by the choice of law rules of the state in which we sit. *Klaxon v. Stentor Electric Mfg. Co., Inc.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *McGowan v. University of Scranton*, 759 F.2d 287, 290 (3d Cir.1985); *DuSesoi v. United Refining Co.*, 540 F.Supp. 1260, 1268 (W.D.Pa.1982) (wrongful discharge action). Therefore, in the present case, Pennsylvania's choice of law rules will apply to the issues raised by this motion.

Traditionally, Pennsylvania's choice of law rule was to apply the law of the jurisdiction where the injury or harm occurred. However, the Supreme Court of Pennsylvania in *Griffith v. United Air Lines, Inc.*, 416 Pa. 1, 203 A.2d 796 (1964), abandoned this strict *lex loci delicti* rule in favor of a more flexible, hybrid analysis of the policies and contacts of the various concerned jurisdictions. In *Griffith,* an airplane crashed in Colorado killing the decedent, a Pennsylvania domiciliary. The court refused to automatically apply the law of the place where the accident occurred, but instead analyzed the policies and interests underlying the particular issue before it. *Id.* at 21, 203 A.2d at 805.

When doing this, it must be remembered that a mere counting of contacts is not what is involved. The weight of a particular state's contacts must be measured on a qualitative rather than a quantitative scale.

*In re Estate of Agostini*, 311 Pa.Super. 233, 252, 457 A.2d 861, 871 (1983). *See also Cipolla v. Shaposka*, 439 Pa. 563, 267 A.2d 854 (1970); *Miller v. Gay*, 323 Pa.Super. 466, 470 A.2d 1353 (1983).

Moreover, the United States Court of Appeals for the Third Circuit has interpreted *Griffith* as adopting a "flexible methodology entailing analysis of the policies and contacts of the various concerned jurisdictions." *Melville v. American Home Assur. Co.*, 584 F.2d 1306, 1311 (3d Cir.1978). "This approach takes into account the contacts establishing significant relationships and the interests and policies that may be asserted by each jurisdiction." *Moser v. Bostitch Division of Textron, Inc.*, 609 F.Supp. 917, 920 (W.D.Pa.1985).

The flexible approach to choice of law issues, adopted by *Griffith* in tort actions, has subsequently been applied to breach of contract cases as well. *DuSesoi v. United Refining Co.*, 540 F.Supp. at 1269. Citing the Restatement (Second), Conflict of Laws § 188, this court in *DuSesoi* reasoned that:

> In examining the contact that a jurisdiction has with a transaction one looks to a number of factors including: the place of contracting; the place of negotiation of the contract; the place of performance of the contract; the location of the subject matter of the contract; and the domicile or residence of the parties to the transaction.

*Id.*

In the instant case, several of these factors weigh strongly in favor of the application of North Carolina law to the Plaintiff's claims: Plaintiff was interviewed in North Carolina; he signed his employment application in North Carolina; he moved to North Carolina and established a permanent residence there; all of his work for Miller was performed in North Carolina; and the basis for this lawsuit, his

discharge, occurred in North Carolina. The only nexus Pennsylvania had with the activity leading to this lawsuit was that Plaintiff read Miller's advertisement in Pittsburgh, Pennsylvania, and that he subsequently signed and mailed his employment contract there. We find these contacts to be incidental when compared to the significant relationship Plaintiff had with North Carolina due to his employment at Miller. When the above factors are coupled with North Carolina's interest in applying its wrongful discharge law to its businesses and workers, it becomes clear that North Carolina law should apply in determining whether Defendant's motion for summary judgment shall be granted.

*Summary Judgment*

Defendant files this Motion for Summary Judgment on the grounds that the uncontroverted facts and the applicable law preclude recovery on either of Plaintiff's counts since he was an at-will employee. When considering a motion for summary judgment, the court, viewing the facts in the light most favorable to the nonmoving party, must determine if there are any genuine issues of material facts. Fed.R.Civ.P. 56. *Meyer v. Riegel Products Corp.,* 720 F.2d 303 (3d Cir.1983), *cert. denied,* 465 U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984); *Betz Laboratories, Inc. v. Hines,* 647 F.2d 402 (3d Cir.1981). The moving party has the burden of proving that no genuine issue exists. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1969); *Butz v. Hertz Corp.,* 554 F.Supp. 1178, 1181 (W.D. Pa.1983). Any doubts must be resolved in favor of the nonmoving party. *Gans v. Mundy,* 762 F.2d 338, 341 (3d Cir.1985) (quoting *Ness v. Marshall,* 660 F.2d 517, 519 (3d Cir.1981). *See also Mariani v. City of Pittsburgh,* 624 F.Supp. 506 (W.D. Pa.1986) (Cohill, C.J.).

*The Tort of Wrongful Discharge*

■ Traditionally, the law of North Carolina did not recognize a cause of action for wrongful discharge unless the legislature explicitly created such a claim by statute. *Dockery v. Lampart Table Co.,* 36 N.C. App. 293, 244 S.E.2d 272, *disc. rev. denied,* 295 N.C. 465, 246 S.E.2d 215 (1978). Moreover, the general common law rule in North Carolina and other jurisdictions, is that when a contract of employment does not fix a definite term the employment is terminable without cause at the will of either party. *Dockery,* 36 N.C.App. at 297, 244 S.E.2d at 275; *see also Nantz v. Employment Security Commission,* 290 N.C. 473, 226 S.E.2d 340 (1976); *Smith v. Ford Motor Co.,* 289 N.C. 71, 221 S.E.2d 282 (1976); *Still v. Lance,* 279 N.C. 254, 182 S.E.2d 403 (1971); *Roberts v. Wake Forest University,* 55 N.C.App. 430, 286 S.E.2d 120, *disc. rev. denied,* 305 N.C. 586, 292 S.E.2d 571 (1982); *Humphrey v. Hill,* 55 N.C.App. 359, 285 S.E.2d 293 (1982).

In *Dockery,* the plaintiff alleged that his employer discharged him in retaliation for filing a worker's compensation claim. Plaintiff argued that allowing employers to discharge employees for filing worker's compensation claims would discourage other employees from filing similar claims, and thus would violate public policy. Emphasizing that the plaintiff was employed for an indefinite duration, and that the North Carolina General Assembly did not provide relief for "retaliatory discharge" that would create an exception to the general rule for at-will employment relationships, the court in *Dockery* refused to find a cause of action in tort for wrongful discharge. 36 N.C.App. at 299–300, 244 S.E.2d at 276–277.

However, in its next session, the North Carolina General Assembly overruled *Dockery* on the specific issue decided there and authorized actions by employees demoted or discharged in retaliation for instituting a worker's compensation claim. N.C.Gen.Stat. § 97–6.1 (1981). Additionally, in a recent decision, *Sides v. Duke Hospital,* 74 N.C.App. 331, 328 S.E.2d 818, *disc. rev. denied,* 314 N.C. 331, 333 S.E.2d 490 (1985), the Court of Appeals of North Carolina, an intermediate appellate court, has further eroded the ironclad rule enunciated in *Dockery.*

In *Sides,* the court recognized an important exception to the general rule that an indefinite contract of employment is terminable at will. The plaintiff in *Sides* alleged that defendant had discharged her from employment as a nurse anesthetist in retaliation for her refusal to perjure herself or withhold information in a malpractice action involving her employer's medical staff. The court held that she stated a valid claim in both contract and tort for wrongful discharge, emphasizing how the state public policy requiring truthfulness before its courts outweighed an employer's freedom to discharge employees at will. *Id.* at 337–342, 328 S.E.2d at 823–826. Further, the *Sides* court reasoned that an employer's power to terminate "at will" cannot be absolute, in light of the many other societal obligations shared by employers and employees. *Id.* at 342, 328 S.E.2d at 826.

Clearly, *Sides* is in line with the developing case law in other jurisdictions which recognizes a public policy exception to the at-will rule when a clearly defined and well-established public policy is threatened by the defendant's action. *See, e.g., Novosel v. Nationwide Insurance Co.,* 721 F.2d 894 (3d Cir.1983) (employee's allegations of discharge for refusal to participate in former employer's lobbying effort and his opposition to company's political stand stated claim for wrongful discharge under the law); *Perks v. Firestone Tire & Rubber Co.,* 611 F.2d 1363 (3d Cir.1979) (public policy embodied in Pennsylvania's anti-polygraph statute made employer's discharge of employee, who refused to submit to a polygraph exam, actionable in tort); *Tameny v. Atlantic Richfield Co.,* 27 Cal.3d 167, 610 P.2d 1330, 164 Cal.Rptr. 839 (1980) (wrongful discharge action sustained against employer who terminated plaintiff for refusing to participate in an illegal scheme to fix retail gasoline prices). *See generally, Protecting Employees At Will Against Wrongful Discharge: The Public Policy Exception,* 96 Harvard L.Rev. 1931 (1983).

However, the Court of Appeals of North Carolina recently qualified its decision in *Sides. See Walker v. Westinghouse Electric Corp.,* 77 N.C.App. 253, 335 S.E.2d 79 (1985). In *Walker,* the court held that: 1) plaintiff was an employee at will and therefore could be terminated for watching television on work time; and 2) that the evidence did not support plaintiff's allegation that his discharge was in retaliation for raising complaints about plant safety. Even though North Carolina has a statute which forbids the retaliatory discharge of employees for raising safety concerns, N.C. Gen.Stat. § 95–130(8) (1981), the *Walker* court hesitated "to establish a general cause of action for wrongful discharge for *any* employee discharged after raising safety concerns. *Id.* at 263, 335 S.E.2d at 86. Moreover, the court stated that "[o]ur decision in *Sides* rested on facts clearly showing a willful violation of the law and was consistent with other jurisdictions' insistence that the employer's conduct be in clear violation of express public policy to be actionable." *Id.*

Applying the above rationale to the record before us, we believe that Plaintiff has failed to present a sufficient forecast of evidence to survive Defendant's motion for summary judgment on this question. Unlike the plaintiff in *Sides,* there is nothing alleged by Mr. Rupinsky which shows that Defendant's conduct was in clear violation of an express public policy. Dep., p. 56; Dep.Ex. 7. Here, the record supports Defendant's argument that Plaintiff was terminated solely because of his managerial shortcomings since Plaintiff's performance appraisal prior to his discharge revealed *inter alia* that "[h]e has not displayed sufficient effort towards the consistent enforcement of safety procedures," that there was "no improvement in rail car loading quality," that he had "a somewhat poor attendance record, and has been less than enthusiastic to volunteer for overtime when necessary." Dep.Ex. 6. In addition, the appraisal noted that Plaintiff needed "constant 'reminding' in order to enforce procedures," that he maintained a narrow view on priorities and objectives, and that "[t]here is a dangerous tendency displayed

to sometimes 'cut corners' or bend rules." *Id.* Thus, in contrast to the plaintiff in *Sides,* who was discharged directly for her refusal to commit perjury, in violation of a clear-cut public policy and not because of incompetence or any legitimate cause, Plaintiff's claim must fail.

■ While there is some inference raised in Plaintiff's brief that he was fired intentionally to keep the warehouse supervisors directly below him from forming a union, we need not address this allegation as it was not properly raised in any pleading, and thus is speculative at best. Dep., pp. 55–56. Alternatively, even if Plaintiff presented a viable claim that he was discharged in retaliation for engaging in union activities, the district court has no jurisdiction over such claim since it is within the exclusive realm of the National Labor Relations Board. 29 U.S.C. § 158(a)(1, 3). *See Viestenz v. Fleming Companies, Inc.,* 681 F.2d 699 (10th Cir.), *cert. denied,* 459 U.S. 972, 103 S.Ct. 303, 74 L.Ed.2d 284 (1982); *Huge v. Long's Hauling Co.,* 442 F.Supp. 1041 (W.D.Pa.1977), *aff'd* 590 F.2d 457 (3d Cir.1978), *cert. denied,* 442 U.S. 918, 99 S.Ct. 2840, 61 L.Ed.2d 285 (1979); *Friends of Yosemite v. Frizzell,* 420 F.Supp. 390 (N.D.Cal.1976) (wrongful discharge claim). *Cf. Bruffett v. Warner Communications, Inc.,* 692 F.2d 910 (3d Cir.1982) (no common-law action in Pennsylvania for discharge of employee on basis of handicap or disability since exclusive remedy was under Pennsylvania Human Relations Act).

*Breach of Contract*

■ Count two of Plaintiff's complaint alleges breach of contract. While Plaintiff concedes that there was no definite or fixed duration to his written contact, he alleges that a contract could be implied from oral promises made to him during his interviews regarding job security, promotions, probationary periods, etc. Specifically, at his deposition, Plaintiff testified that during the course of his interview with a Mr. Bodin, he was told of Miller's future plans for expansion and what effect it would have on his employment there. Plaintiff described this discussion as follows:

Q  And what is it that you recall?

A  He said that layoffs, that really they were never even heard of there at Miller Brewing Company at the time because they were growing fairly rapidly, and he said probably for the next five or six years you wouldn't have to worry about anything like that; and as far as the promotions and job performance, he said as long as you would do your job and do it good, that you would be promoted and more or less taken care of.

> .        .        .        .        .

Q  You didn't view it as some sort of a personal guarantee to you that you would have employment there in Eden for a certain period of time, did you?

A  By the way he was talking, as long as I did my job the way I did do it, I looked at it that way, yes.

Q  There at the Eden facility?

A  Right.

Q  Do you have a specific recollection of Mr. Bodin mentioning a time period?  I think earlier you had testified five to six years.

A  Right.

Q  Do you have a specific recollection of him telling you that you didn't have to worry for five to six years?

A  Well, he just more or less just pulled that number out of a hat, five to six years.  They were growing very rapidly, and they had plans for plants in the next five to six years.

> .        .        .        .        .

Q  I believe you also testified that during the course of your interview with Mr. Bodin, he mentioned something about a 90-day probationary period.

How did that issue come up?

A  Well, I asked him, okay, say you start a new job and you weren't doing the job as good as, say, your supervisor thought you should be doing it, I asked him, how do you usually handle something like that.  He said, the supervisor more or less will sit down and talk with

you, and if you really aren't doing a good job, you would be put on a 90-day probationary period in order to in that time start getting back into the program or be doing what you are supposed to be doing.

Q   Did he indicate to you that that was a practice that would apply to the position for which you were applying?

A   That was applied to supervisory personnel, and that would be in the supervision.

Q   Did you ask if that practice or policy was in writing anywhere?

A   No, I didn't.

Q   Did he indicate whether or not it was in writing?

A   No.

Dep., pp. 22, 25, 27–28.

Our review of the record discloses that Plaintiff has failed to demonstrate the existence of a specific oral agreement of a fixed duration of employment.  Accepting his deposition testimony as true for purposes of this motion, at best, Plaintiff has only shown that one of four Miller Brewing Co. representatives who interviewed him suggested that Miller had plans to expand for some indefinite period of time and that Plaintiff would be promoted if he performed well.  *Id.* at pp. 25–27.  However, we find that this discussion does not rise to the level of a promise of a definite duration of employment under North Carolina law.  *Nantz v. Employment Security Commission, supra; Still v. Lance, supra.*

In the analogous case of *Roberts v. Wake Forest University, supra,* plaintiff argued that the circumstances surrounding the making of his employment contract revealed that the parties intended it to be for at least six years.  Roberts, who was hired as Associate Athletic Director to coach the golf team, alleged that university personnel made statements indicating that they expected him to remain with the university for a substantial time period.  Roberts also averred that the university personnel represented that employees were not customarily dismissed without reason and that it was the "custom and usage" for golf coaches to serve for long terms.  The court, however, found all of this insufficient to establish the existence of a contract for a fixed term and stated "that this evidence at best reveals the hope by the parties that plaintiff would perform his duties satisfactorily and maintain a good program ..." *Id.* 55 N.C.App. at 435, 286 S.E.2d at 123.

Another instructive case is *Bennett v. Eastern Rebuilders, Inc.,* 52 N.C.App. 579, 279 S.E.2d 46 (1981), where the plaintiff, like Mr. Rupinsky, was discharged after first being promoted.  Bennett alleged her employer promised her that if she did not perform satisfactorily in her new position, she would be able to return to her old job.  The court found this promise to be enforceable, as Bennett had relinquished her union representation when she left her prior position.  The court, however, stopped short of reinstating her and awarded only nominal damages since Bennett's status as an employee-at-will enabled her employer to discharge her immediately upon her return to her original job.  *Id.* at 583, 279 S.E.2d at 50.

■   Plaintiff also alleges that a contract could be implied from the personnel policies included in Miller's employee benefit handbook as well as those mentioned at a human relations seminar.  While we are aware of the growing trend in many jurisdictions to find an express or implied contract from personnel handbooks, company manuals, oral promises, etc., *see, e.g., Toussaint v. Blue Cross & Blue Shield,* 408 Mich. 579, 292 N.W.2d 880 (1980); *Weiner v. McGraw Hill, Inc.,* 57 N.Y.2d 458, 443 N.E.2d 441, 457 N.Y.S.2d 193 (1982), the general rule in North Carolina remains that a contract of employment which contains no definite term or fixed duration is ordinarily not enforceable.  *Still v. Lance, supra; Walker v. Westinghouse Electric Corp., supra.*

In *Walker,* which we discussed earlier, plaintiff, a senior electrician for Westinghouse, was fired for watching television on the job.  Although Walker had no written contract, he argued that defendant's per-

sonnel manual contained policies which formed the basis for an implied contract. However, the court rejected this argument, holding that "the law of North Carolina is clear that unilaterally promulgated employment manuals or policies do not become part of the employment contract unless expressly included in it." *Walker, supra,* 77 N.C.App. at 259, 335 S.E.2d at 83–84. *See Smith v. Monsanto Co.,* 71 N.C.App. 632, 322 S.E.2d 611 (1984); *Griffin v. Housing Authority,* 62 N.C.App. 556, 303 S.E.2d 200 (1983); *Williams v. Biscuitville, Inc.,* 40 N.C.App. 405, 253 S.E.2d 18, *disc. rev. denied,* 297 N.C. 457, 256 S.E.2d 810 (1979). *But cf. Brooks v. Carolina Telephone and Telegraph Co.,* 56 N.C.App. 801, 290 S.E.2d 370 (1982) (summary judgment denied for employer on question of whether employee was entitled to termination pay as provided in personnel policy; however, court noted such policy could be cancelled at will by the employer). This result has also been reached by federal courts in their application of North Carolina law. *See Watkins v. Milliken & Co.,* 613 F.Supp. 408 (D.C.N. C.1984); *Cote v. Burroughs Welcome Co.,* 558 F.Supp. 883 (E.D.Pa.1982).

Illustrative of the protection which North Carolina law accords its employers is *Williams v. Biscuitville, Inc.* where the employer failed to follow its own announced personnel policy, yet the court found no breach of contract. The *Williams* court stressed that personnel policies are not part of the employment contract when they are unilaterally implemented by the employer, who has complete discretion to change them. *Id.* at 408, 253 S.E.2d at 20. Therefore, Plaintiff's claim that a contract was created by personnel policies in the benefit handbook or by discussions at a human relations seminar must be denied. Further, there is nothing in the record which reveals any violation of "good faith" on the part of Defendant in discharging Plaintiff. *Walker, supra,* 77 N.C.App. at 261–262, 335 S.E.2d at 85. This result is buttressed by our earlier finding that Plaintiff's discharge did not violate any express public policy and that Defendant had a plausible and legitimate reason for terminating Plaintiff.

█ Finally, Plaintiff contends that his relocation to North Carolina and the resulting expenditures constitutes additional consideration which restricts Defendant's right to terminate him at will. At first, this position may seem to be supported by *Sides v. Duke Hospital, supra,* which recognized a claim for breach of an indefinite-term contract where the plaintiff alleged that she had moved from Michigan to Durham in reliance on promises that she would only be terminated for incompetence. However, as we noted earlier, *Sides* involved conduct on behalf of the defendant which was unlawful and thus called into play the public policy exception. The *Sides* court explicitly stated:

> The additional consideration that the complaint alleges, her move from Michigan, was sufficient, we believe, to remove plaintiff's employment contract from the terminable-at-will rule and allow her to state a claim for breach of contract *since it is also alleged that her discharge was for a reason other than the unsatisfactory performance of her duties.*

*Id.* at 345, 328 S.E.2d at 828 (emphasis added). Here, Plaintiff was discharged for managerial incompetence and the record is devoid of any unlawful behavior by Defendant which would be comparable to the situation in the *Sides* case.

North Carolina courts have been hesitant to find extra consideration which takes employment contracts beyond this at-will limitations. *See, e.g., Tuttle v. Kernersville Lumber Co.,* 263 N.C. 216, 139 S.E.2d 249 (1964) (court found no additional consideration in oral promises to employee that he would have a permanent job as long as his work was satisfactory); *Malever v. Kay Jewelry Co.,* 223 N.C. 148, 25 S.E.2d 436 (1943) (employer had no permanent obligation to employ even though employee moved to Charlotte from Fayetteville on promise of permanent employment). *But see Dotson v. F.S. Royster Guano Co.,* 207 N.C. 635, 178 S.E. 100 (1935) (extra consid-

eration found where employee relinquished accident claim against employer for personal injuries in consideration for lifetime employment); *Jones v. Carolina Power & Light Co.*, 206 N.C. 862, 175 S.E. 167 (1934) (contract for "permanent employment for a term of at least ten years" held supported by plaintiff's leaving another job to come break a strike against employer); *Fisher v. John L. Roper Lumber Co.*, 183 N.C. 485, 111 S.E. 857 (1922) (promise of lifetime employment upheld since plaintiff relinquished his claim against employer for injuries). *See generally,* Larson, *Unjust Dismissal,* § 10.34 (Matthew Bender 1985). Applying the rationale of the above cases to this issue, we are constrained in our ability to find additional consideration here, and, therefore, we conclude that Plaintiff's employment contract was terminable-at-will.

In conclusion, we recognize the disparity of power and the potential for unfair results which is inherent in an employment relationship like the present one. We are also cognizant of decisions from courts in the last decade or so which have eaten away at the employment-at-will doctrine in situations where the court can find that contractual-type promises were made or that an express public policy was clearly violated. However, as a federal district court sitting in diversity jurisdiction, we do not write on a clean slate, and we must apply the established precedent of North Carolina, *Bruffett v. Warner Communications, Inc., supra,* 692 F.2d at 918, which has shown judicial conservatism toward allowing relief for discharged-at-will employees. While it is possible that the law of North Carolina will progressively evolve and follow the lead of those jurisdictions recognized as vanguards in wrongful discharge litigation, our role is not that of a soothsayer and for this reason we decline this invitation to create new law for North Carolina; such a function is solely within the province of the courts and legislature of that state.

Accordingly, we will grant Defendant's Motion for Summary Judgment since Plain-

tiff has no right to relief under either his tort or contract claim.

An appropriate order will be entered.